# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ROSE QUINTANA and CORY
HICKERSON, Individually, and as the
Personal Representatives of the ESTATE
OF RICARDO JOSE ORTIZ, deceased,

        Plaintiff,

vs.                                              No. CIV 18-0043 JB\LF

SANTA FE COUNTY BOARD OF
COMMISSIONERS; ANNE ROBINSON,
in her individual capacity; DYLAN
CHAVEZ, in his individual capacity;
ANTHONY VALDO, in his individual
capacity; TYLER LOPEZ, in his
individual capacity; LEONARD
GARCIA, in his individual capacity, and
CRISTOBAL GALLEGOS, in his
individual capacity,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Dismiss, filed April 27, 2018 (Doc. 13)("MTD"); and (ii) the Plaintiffs' Motion to Amend the Complaint, filed September 12, 2018 (Doc. 30)("MTA"). The primary issues are: (i) whether qualified immunity bars the Plaintiffs' claims against Defendant Santa Fe County Board of Commissioners in Santa Fe, New Mexico ("Santa Fe County") under 42 U.S.C. § 1983 for its customs or practices of not providing appropriate medical attention to inmates in withdrawal, of not training its nurses to intake inmates suffering withdrawal, and of not training its employees to provide medical attention to inmates suffering withdrawal; (ii) whether the N.M. Stat. Ann. § 41-4-6 negligent-operation-of-

a-building immunity waiver in the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 through 41-4-27 ("NMTCA"), applies where the Plaintiffs' claims relate to negligent supervision and medical treatment of inmates in a building, so that Plaintiffs Rosa Quintana, Ricardo Jose Ortiz' partner and his children's mother, see First Amended Complaint for Violations of the New Mexico Wrongful Death Act, the New Mexico Tort Claims Act, and the Federal Civil Rights Statute ¶ 1, at 2, filed April 11, 2018 (Doc. 10)("First Amended Complaint"), and Cory Hickerson, Ortiz' brother, see First Amended Complaint ¶ 2, at 2, have stated a claim upon which relief can be granted against Santa Fe County for failure to provide proper medical attention to inmates suffering heroin withdrawal or to train its employees to provide such attention; (iii) whether the NMTCA's § 41-4-9 medical-facility waiver applies to Santa Fe County when the Plaintiffs allege facts related to Santa Fe County Adult Detention Facility ("ADF")'s Medical Unit, so that the Plaintiffs have stated a claim upon which relief can be granted; and (iv) whether the Court should grant the Plaintiffs leave to amend the First Amended Complaint to add new factual allegations. The Court concludes that: (i) Defendants Dylan Chavez, Anthony Valdo, Tyler Lopez, Leonard Garcia, and Cristobal Gallegos (the "individual Defendants") are entitled to qualified immunity, so the Court dismisses the § 1983 claims against them; (ii) with no federal claims remaining in the case, the Court remands the case to state court for determination of the NMTCA claims against Santa Fe County; and (iii) the Second Amended Complaint for Violations of the New Mexico Wrongful Death Act, the New Mexico Tort Claims Act, and the Federal Civil Rights Statute, filed September 12, 2018 (Doc. 30-1)("Proposed Second Amended Complaint") cannot survive a motion to dismiss, so the Court denies the MTA, because the amendment is futile.

## FACTUAL BACKGROUND

The Court takes its facts from the First Amended Complaint. The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely the Plaintiffs' version of events.

The lawsuit arises from Ortiz' January 7, 2016, death while in the ADF's custody. See First Amended Complaint at 1-2. Quintana, a resident of Santa Fe County, New Mexico, was Ortiz' partner before his death, and is his children's mother. See First Amended Complaint ¶ 1, at 2. Hickerson, a resident of Bernalillo County, New Mexico, is Ortiz' brother. See First Amended Complaint ¶ 2, at 2. Ortiz was a resident of Rio Arriba County, New Mexico at the time of his death. See First Amended Complaint ¶ 3, at 2. Santa Fe County "owned, operated, and maintained" the ADF, and the ADF employed Defendants Anne Robinson, a medical intake nurse; Anthony Valdo, a Classification Officer, responsible for classifying inmates into housing units; Dylan Chavez, Tyler Lopez, and Leonard Garcia, Corrections Officers; and Cristobal Gallegos, a Corporal[1]. First Amended Complaint ¶¶ 4-10, 119, 136, 155, 164, at 2-4, 18, 20, 22-23.

In 2010, Ortiz sustained a severe back injury requiring surgery and developed a dependency on his prescription opiates. See First Amended Complaint ¶¶ 25, 27, at 6-7. From 2010 onwards, Ortiz struggled with substance, particularly opiate, abuse and with mental health problems, particularly depression and anxiety. See First Amended Complaint ¶¶ 24-44, at 6-9. In 2013, doctors at Christus St. Vincent's Hospital in Santa Fe, New Mexico, diagnosed Ortiz with

---

[1]The Plaintiffs do not define the role of a Corporal, but the Court assumes, based on the context, that it is a non-medical corrections officer with supervisory responsibilities.

"depression, anxiety, a history of polysubstance abuse, and Hepatitis C." First Amended Complaint ¶ 38, at 8.

Between June, 2013, and February, 2015, Ortiz entered the ADF at least seven times, in connection with his substance abuse. See First Amended Complaint ¶¶ 36, 46, at 8-9. On June 6, 2013, the ADF first booked Ortiz, and, after completing a "Medical Intake History and Screening Form," which notes Ortiz' daily use of 2 grams of heroin and assigns Ortiz a COWS Score[2] of 3, the ADF's Medical Unit recommended housing Ortiz "in the general inmate population." First Amended Complaint ¶¶ 49-50, at 10. On July 3, 2013, the ADF partially completed a "Medical Services Form," which indicates that Ortiz has no medical restrictions but leaves blank the "'intake housing recommendation' section," and completed a "'History and Physical' form not[ing] a history of substance abuse." First Amended Complaint ¶¶ 55-56, at 10-11. The First Amended Complaint states that "[i]t is unclear whether Mr. Ortiz was offered withdrawal medications in connection with this incarceration." First Amended Complaint ¶ 57, at 11.

On November 5, 2013, ADF booked Ortiz again, and completed a "History and Physical" form noting Ortiz' history of substance abuse and checking a box for "Follow-up PRN."[3] First

_____

[2]The First Amended Complaint states that, on the Plaintiffs' information and belief, "'COWS' stands for Clinical Opiate Withdrawal Scale, an evidence-based, 11-item system for evaluating a patient for observable signs of opiate withdrawal, and monitoring the patient's symptoms over time, designed to be administered by a clinician." First Amended Complaint ¶ 51, at 10.

[3]MedicineNet defines p.r.n. as an abbreviation "meaning 'when necessary' (from the Latin 'pro re nata', for an occasion that has arisen, as circumstances require, as needed)." Medical Definition of p.r.n., MedicineNet https://www.medicinenet.com/script/main/art.asp?articlekey=8309 (last visited Feb. 2, 2019). According to the Cooperative of American Physicians, "[w]hen no specific follow-up is required"

Amended Complaint ¶ 59, at 11.  At intake, the ADF's Medical Unit also completed a "Medical Intake History and Screening" form noting Ortiz' "history of heroin abuse" and "recent treatment for anxiety, depression, and PTSD," but leaving blank a portion of the form asking whether the inmate "get[s] sick when [the inmate] stop[s] using drugs."  <u>See</u> First Amended Complaint ¶¶ 58-60, at 11.  Ortiz requested "housing in Safekeeping" but "[t]he Medical Unit instead recommended him for placement into general population."  First Amended Complaint ¶ 58, at 11.

On December 20, 2013, Ortiz "was booked back into ADF after violating his conditions of release by leaving the Hoy Recovery center[4] before his treatment was complete, after the center concluded it could not meet his health needs."  First Amended Complaint ¶ 61, at 11.  After completing another "Medical Intake History and Screening" form, which documented no drug use or history despite Ortiz' transfer to the ADF directly from a detoxification facility, and despite his request for "housing in Safekeeping," the Medical Unit recommended housing him in general

---

after a doctor's appointment, "a 'return if any problems' (specific problems can be noted if needed) or just f/u PRN in the note means the doctor gave the patient the responsibility to decide when to return."  Diana Douglas, <u>Documenting Patients Return Visit and Following Up on Missed Appointments</u>, Cooperative of Am. Physicians (Dec. 1, 2018), https://www.capphysicians.com/articles/documenting-return-visit-even-if-its-prn.

[4]Hoy Recovery Center is a reference to the HOY Recovery Program, which is:

a drug or alcohol rehabilitation center with a primary focus on substance abuse treatment based at State Road 68 Marker 8 Alcalde Road 48 County Road 0041 in Alcalde, NM.  The facility provides detoxification services to the public.  The treatment center provides residential short-term treatment and residential long-term treatment care.

<u>HOY Recovery Program, Inc.</u>, CiteHealth, https://citehealth.com/rehab-centers/new-mexico/cities/alcalde/hoy-recovery-program-inc (last visited Feb. 2, 2019).

population. First Amended Complaint ¶¶ 61-63, at 11. The ADF placed Ortiz on suicide watch. See First Amended Complaint ¶ 63, at 11.

On September 3, 2014, the ADF booked Ortiz again. See First Amended Complaint ¶ 64, at 12. The Medical Unit prepared a "History and Physical" form upon intake, describing Ortiz as a heroin user who last used two months before the intake. First Amended Complaint ¶ 64, at 12. On September 5, 2014, the ADF placed Ortiz on an "opiate protocol." First Amended Complaint ¶ 65, at 12. On September 12, 2014, the Medical Unit completed a "Medical Intake History and Screening" form for Ortiz, which "is left mostly blank." First Amended Complaint ¶ 66, at 12. On September 25, 2014, the ADF booked Ortiz again, completing a "Medical Intake History and Screening" form which asserts that Ortiz "does not take drugs, and does not note any history of substance abuse." First Amended Complaint ¶ 67, at 12. The Medical Unit recommended housing Ortiz in the ADF's general population. First Amended Complaint ¶ 67, at 12. At the time, Ortiz "had been diagnosed with Hepatitis C." First Amended Complaint ¶ 68, at 12. On February 11, 2015, the ADF booked Ortiz again, and the Medical Unit recommended housing him in general population despite his request for placement in "Safekeeping." First Amended Complaint ¶ 69, at 12. No records reflect Ortiz receiving treatment for his substance abuse during this incarceration. See First Amended Complaint ¶ 70, at 12.

On January 4, 2016, the Santa Fe County Sheriff's Office ("Sheriff's Office") arrested Ortiz "on charges including larceny." First Amended Complaint ¶ 71, at 12. On the Plaintiffs' information and belief, "Ortiz had been heavily using heroin and other opiates" at the time of his arrest. First Amended Complaint ¶ 72, at 13. Upon Ortiz' arrival at the ADF, Robinson

interviewed Ortiz.  See First Amended Complaint ¶ 74, at 13.  Robinson later told the Sheriff's Office that she "completed paperwork related to Mr. Ortiz' intake."  First Amended Complaint ¶ 75, at 13.

The ADF's Intake Guidelines include "Guidelines governing the proper performance of an 'Initial Poly-Substance Abuse Assessment' and a subsequent 'Poly-Substance Abuse Withdrawal Assessment.'"  First Amended Complaint ¶ 76, at 13.  The ADF's Intake Guidelines also require intake nurses to "fully complete and sign a 'Medical Intake History and Screening' form for each inmate."  First Amended Complaint ¶ 77, at 13.  Regarding inmate substance abusers, the Intake Guidelines provide that most inmate substance abusers are still intoxicated during their intake assessments and that, because the individuals are not in withdrawal yet, personnel must assess them for "predictors of severe withdrawal" and reassess their symptoms within two hours from the time they ceased their substance use.  First Amended Complaint ¶ 78, at 13.  The ADF trains intake nurses to inquire at intake whether inmate substance abusers become "ill when [they] cease[] to use drugs," and requires intake nurses to "evaluate inmates for predicators of severe alcohol withdrawal and note their last use of opioids."  First Amended Complaint ¶¶ 79-80, at 13-14.  Intake nurses "completing a [sic] 'Initial Poly-Substance Abuse Assessment' for an inmate substance abuser are required to set forth a 'treatment plan' for the inmate," and should evaluate the individuals' withdrawal symptoms and consider recommending housing individuals "at risk of severe opiate withdrawal in the medical unit."  First Amended Complaint ¶ 82, at 14.  "Medical staff" should continue to monitor individuals undergoing opiate withdrawal, "with subsequent, regular assessments using validated tools like COWS," and the evaluations should occur "at least

twice daily." First Amended Complaint ¶¶ 83-84, at 14. The ADF's medical intake forms require intake nurses "to determine whether a COWS evaluation was performed." First Amended Complaint ¶ 86, at 14.

Robinson did not receive orientation for performing medical intakes, and her evaluation of Ortiz was consequently deficient. See First Amended Complaint ¶¶ 86-87, at 14. The First Amended Complaint contends that Robinson's deficient evaluation "proved fatal to [Ortiz'] efforts to safely withdraw from heroin while incarcerated." First Amended Complaint ¶ 87, at 14. Robinson left several portions of Ortiz' "'Medical Intake History and Screening' Form" blank and did not perform "multiple critical assessments." First Amended Complaint ¶¶ 88-89, at 14. Robinson "noted no track marks on Mr. Ortiz' person -- though these were later identified in the [Office of the Medical Investigator ('OMI')] report." First Amended Complaint ¶ 90, at 15. Robinson noted that Ortiz used drugs, specifically heroin, but did not answer the Medical Intake History and Screening Form's question whether Ortiz would get sick when he stopped using drugs, see First Amended Complaint ¶ 91, at 15; recorded that Ortiz had no medical problems "requiring immediate attention," First Amended Complaint ¶ 92, at 15; and answered that Ortiz had no current signs or symptoms of withdrawal, although an inmate who observed Ortiz "around the same time noted that he looked sick," First Amended Complaint ¶ 93, at 15. Robinson did not complete the section of the Medical Intake History and Screening Form asking whether Ortiz "had been 'on medications while in jail/prison that [he] did not take while out.'" First Amended Complaint ¶ 94, at 15. Robinson stated that Ortiz suffered no chronic illnesses or conditions, see First Amended Complaint ¶ 95, at 15; despite the ADF's "documented record of Mr. Ortiz' suffering from

Hepatitis C," and she did not sign the Medical Intake History and Screening Form, First Amended Complaint ¶ 99, at 15. Robinson noted that Ortiz requested special housing, citing safety concerns. See First Amended Complaint ¶ 96, at 15. Robinson, however, recommended that the ADF house him in "General Population." First Amended Complaint ¶ 97, at 15. Robinson left blank, unsigned, and undated, the Medical Intake History and Screening Form's portion inquiring whether the ADF "should observe any Medical Restrictions" for Ortiz. First Amended Complaint ¶ 98, at 15.

Robinson "failed to complete the most relevant portions of an 'Initial Poly-Substance Abuse Assessment' for Mr. Ortiz." First Amended Complaint ¶ 100, at 16. On the Initial Poly-Substance Abuse Assessment, Robinson noted Ortiz' pupil size as 3,[5] and his respiratory rate as "an elevated 20 breaths per minute,"[6] but "did not assess his capillary refill time."[7] First Amended Complaint ¶ 101, at 16. Robinson did not evaluate Ortiz "for predicators of severe alcohol

---

[5]Ortiz' pupil size was within the normal range, "between 2 and 5 millimeters, although the lighting plays a large part in that spectrum." What is Normal Pupil Size?, Reference, https://www.reference.com/health/normal-pupil-size-43477cb1a4fe61cb (last visited Feb. 2, 2019).

[6]The "average respiratory rate in a healthy adult is between 12 and 18 breaths per minute." Lynne Eldridge, What is a Normal Respiratory Rate?, verywellhealth, https://www.verywellhealth.com/what-is-a-normal-respiratory-rate-2248932 (last visited Feb. 2, 2019).

[7]Although the Plaintiffs allege that Robinson's failure to assess Ortiz' capillary refill time is an example of her failure "to complete the most relevant portions" of Ortiz' intake, First Amended Complaint ¶¶ 100-101, at 15, capillary refill time is measured to provide an indication of "dehydration and decreased peripheral perfusion," or "peripheral artery disease," none of which the Plaintiffs allege contributed to Ortiz' condition or death. Capillary Refill, Wikipedia, https://en.wikipedia.org/wiki/Capillary_refill (last visited Feb. 2, 2019). Capillary refill tests are "affected by many different external factors and therefore should not be relied upon as a universal diagnostic measure." Capillary Refill, supra,.

withdrawal or note his last use of opioids," First Amended Complaint ¶ 102, at 16, and left blank the Initial Poly-Substance Abuse Assessment's treatment plan section, which required her to determine whether Ortiz "should be housed in the medical unit," whether Ortiz reported "a history of illicit opioid use," whether the Medical Unit had completed a COWS for Ortiz, and whether Ortiz had attended opioid overdose training "or needed to be referred for it," and required her to set a time to reassess Ortiz' conditions. First Amended Complaint ¶ 104, at 16. On the "Poly-Substance Withdrawal Assessment," Robinson recorded Ortiz' "vital signs and his alcohol withdrawal assessment," First Amended Complaint ¶ 107, at 16, but she did not complete the "Opioid Withdrawal Assessment," First Amended Complaint ¶ 108, at 16. Robinson did not sign or date the form. See Complaint ¶ 106, at 16. The forms that Robinson left "nearly-blank" "are the only withdrawal assessments in the record for" Ortiz' January, 2016, incarceration. First Amended Complaint ¶ 109, at 16. Ortiz requested of Robinson "that he be placed in a cell by himself 'because I'm going to kick real hard,' referring to his imminent heroin withdrawals," First Amended Complaint ¶ 110, at 17, but Robinson instead "recommended him for placement in the general inmate population," First Amended Complaint ¶ 111, at 17.

Robinson offered and Ortiz accepted a "'kick kit' -- a packet of medications (in this case, Dicyclomine, Methocarbamol, Loperamide, Hydroxyzine, and Promethazine) given to inmates to assist with their withdrawal symptoms." First Amended Complaint ¶¶ 112-13, at 17. "A Physicians Order form shows that a five-day opiate-withdrawal protocol -- aka a 'kick kit' -- was ordered for Mr. Ortiz on January 4, 2016 at 2:50 p.m.," and, "f[]urther, a 'Debit Memo' form generated by ADF shows that Mr. Ortiz personally signed and authorized a request for a $7.50

withdrawal from his inmate account in order to receive the medications." First Amended Complaint ¶¶ 114-15, at 17. The accounts of the ADF's staffers "vary as to whether," after Ortiz paid for the kick kit, he "was offered and/or declined the withdrawal medications . . . at any other day or time throughout his final incarceration, from January 4 until his death on January 7, 2016." First Amended Complaint ¶ 117, at 17. According to Robinson, Ortiz "accepted and took" the kick kit on January 4, 2016, but Chavez contends that he spoke with Ortiz during the evening of January 5, 2016, and that Ortiz refused the kick kit. First Amended Complaint ¶¶ 118-19, at 17-18. Upon the Plaintiffs' information and belief, Ortiz did not receive his kick kit, nor did the ADF's staff "adequately monitor him" for heroin withdrawal symptoms, "let alone refer him to the Medical Unit for what could have been life-saving treatment when they observed him to be in the throes of severe illness." First Amended Complaint ¶ 120, at 18.

Upon the Plaintiffs' information and belief, the kick kit's medications "do not meet the standard of care for treating opiate withdrawal, because they did not include methadone and buprenorphine."[8] First Amended Complaint ¶ 122, at 18. The ADF's kick kit treats "discrete symptoms of withdrawal, like nausea, vomiting, diarrhea, and stomach cramps," whereas the "use of Medication-Assisted Treatment (MAT)," including methadone and buprenorphine, "has been

---

[8]Methadone and buprenorphine are opioid agonists, which bind "to the same receptors in the brain that were activated by the drug of abuse, but in a safer and more controlled manner." Methadone and Buprenorphine: Opioid Agonist Substitution Tapers, Providers Clinical Support Sys. (Dec. 6, 2017, https://pcssnow.org/resource/methadone-buprenorphine-opioid-agonist-substitution-tapers/. Opioid agonists, like methadone and buprenorphine, "can reduce the symptoms of withdrawal and reduce cravings, allowing for a more gradual, controlled recovery process and reducing the risk of relapse. Methadone and Buprenorphine: Opioid Agonist Substitution Tapers, supra.

shown to greatly reduce mortality" in other correctional facilities, "even in non-overdose situations." First Amended Complaint ¶¶ 122-23, at 18. MAT has been adopted by jails across the United States, and, in Australia, reduced deaths occurring early in incarceration by ninety-four percent. See First Amended Complaint ¶¶ 124-25, at 18. The National Commission on Correctional Healthcare, "the national leader in establishing standards of care in jails and prisons in the United States," endorses MAT and Dr. Homer Venters, "a national expert in providing health services to the incarcerated, former Medical Director and Chief Medical Officer of New York City's Jail Correctional Health Service, and current Director of Programs for Physicians for Human Rights" describes methadone use as the standard of care for "tapered" opiate detoxification and describes kick kits as "substandard and ill-advised." First Amended Complaint ¶ 127, at 19.

On January 4, 2016, inmates and staff at the ADF observed Ortiz' symptoms. See First Amended Complaint ¶¶ 128-67, at 19-23. Ronnie Montano, who "was housed with Mr. Ortiz during his initial intake" and who roomed with Ortiz in general population housing for one day, observed that, "throughout their incarceration together," Ortiz looked sick and vomited "numerous times" around the cell. See First Amended Complaint ¶ 128, at 19. When Montano asked the ADF staff to clean the cell, they relocated Montano to another cell. See First Amended Complaint ¶ 129, at 19. Chavez observed Ortiz "experiencing symptoms of severe heroin withdrawal," during the evening of January 4, 2016, and Ortiz informed Chavez that he was withdrawing and "throwing up blood." See First Amended Complaint ¶ 131, at 19. Chavez informed the "next shift of corrections officers" about Ortiz' condition but did not assist Ortiz or refer Ortiz to the Medical "for observation and treatment." See First Amended Complaint ¶¶ 132-33, at 19-20. Contrary to

the ADF's policy, the ADF generated "no medical report" for Mr. Ortiz.  <u>See</u> First Amended Complaint ¶ 134, at 20.

Through January 5 and 6, 2016, Ortiz' condition worsened, but the ADF staff did not provide medical assistance.  <u>See</u> First Amended Complaint ¶ 135, at 20.  On the morning of January 5, 2016, Valdo met with Ortiz to classify Ortiz "in the appropriate housing unit," and, despite, Ortiz' "severely ill" appearance, statements about his withdrawal, and request for housing in "safe keeping," Valdo classified him to general population housing.  First Amended Complaint ¶¶ 136-38, at 20.  Later that morning, at 11:47 a.m., surveillance video of Ortiz' unit shows a corrections officer escorting Ortiz out of his cell and down the hall as he is "swaying from side to side and bumping into the wall," and at 11:50 a.m., escorting Ortiz back to his cell.  First Amended Complaint ¶¶ 141-42, at 20.  The corrections officer in the video did not seek medical assistance for Ortiz, "there was no medical report form generated," and "no observation logs" for Ortiz' cell "appear to have been generated for this date, and there does not appear to be any record of whether Mr. Ortiz was offered, accepted, and/or declined his withdrawal medications."  First Amended Complaint ¶¶ 143-45, at 21.  On January 6, 2016, Ortiz' "medical situation became critical."  First Amended Complaint ¶ 146, at 21.  The ADF's surveillance video shows Ortiz "swaying on his feet while being moved from a holding cell at 2:20 a.m." and struggling to "drag a mattress to his cell . . . at 2:43 a.m."  First Amended Complaint ¶¶ 147-48, at 21.  The surveillance video of Ortiz' cell "inexplicably 'jumps' from one time to another, several minutes later, during the morning and afternoon of January 6, 2016 . . . , includ[ing] a jump from 3:09:25 a.m. to 3:47:52 a.m. -- so that 38.5 minutes of footage are missing."  First Amended Complaint ¶¶ 149-50, at 21.  According to

the ADF's records, Ortiz declined withdrawal medication when offered them "at 10:07 a.m., 3:45 p.m., and 8:46 p.m. on January 6," and according to the ADF's Nurse Kathleen Silva, "who was on duty at ADF at the time of Mr. Ortiz' death," the ADF does not dispense withdrawal medications to inmates who "feel they don't need [them]" or are not inclined to take them. First Amended Complaint ¶¶ 151-52, at 21. The ADF's policy regarding administering withdrawal medication to inmates includes no exception "for inmates who are severely ill, and/or who are unable to understand the consequences of failure to take their withdrawal medications." First Amended Complaint ¶ 153, at 22. Video of "the holding cell area of the Alpha Unit," where Ortiz was housed, does not show the ADF's staff approaching Ortiz' cell at the times that they purportedly offered Ortiz withdrawal medications, and, the video does not skip at the times the ADF staff purport to have offered Ortiz the medications. See First Amended Complaint ¶ 154, at 22. On January 6, 2016, Lopez, who was on duty in Ortiz' housing unit on January 6, 2016, saw Ortiz "dry heaving" and saw vomit on Ortiz' cell floor. First Amended Complaint ¶¶ 155, 157, at 22. Lopez observed that Ortiz "didn't say much," was "very quiet," "looked sick," and had a "blank stare" when not "excessively vomiting." First Amended Complaint ¶¶ 156, 158-59, at 22. Lopez did not call for medical assistance, "nor did he continue to monitor [Ortiz'] medical situation." See First Amended Complaint ¶ 160, at 22. By his own admission, Lopez "got busy during the day," and "failed to even arrange for Mr. Ortiz' cell to be cleaned." First Amended Complaint ¶ 161, at 22. Abdias Flores, an inmate in the cell adjacent to Ortiz' cell, "heard Mr. Ortiz 'groaning throughout the night' of January 6 and early morning hours of January 7" and watched Ortiz "curled up in a ball in bed while ill." First Amended Complaint ¶¶ 162-63, at 23.

Flores "knew that Mr. Ortiz was 'kicking' from heroin."  First Amended Complaint ¶ 163, at 23.

Garcia, on duty from 6:00 p.m. on January 6, until after 6:00 a.m. on January 7, "later told investigators he had observed Mr. Ortiz sitting on the toilet 'and breathing' late on the evening of January 6," but no surveillance footage shows anyone approaching Ortiz' cell after 12:43 p.m. on January 6, 2016.  First Amended Complaint ¶ 164, at 23.  Security "videos of the housing units at ADF operate by motion detector -- if a person moves in the area on which the security camera is trained, the camera turns on and records the action."  First Amended Complaint ¶ 166, at 23.  The ADF staff generated no medical report for Ortiz on January 6, 2016.  See First Amended Complaint ¶ 167, at 23.  On January 7, 2016, Garcia purportedly observed Ortiz.  See First Amended Complaint ¶ 168, at 23.  Garcia told investigators that he saw Ortiz "lying on his bed in the fetal position" at 6:40 a.m."  First Amended Complaint ¶ 168, at 23.  No "motion-activated security video," however, shows Garcia approaching Ortiz' cell, and Garcia's claim to investigators that Ortiz showed no discomfort contradicts Montano's account.  See First Amended Complaint ¶¶ 169-70, at 23.

On January 7, 2016, at 8:09 a.m., another ADF employee, Gallegos, "heard [Ortiz] 'pushing' and 'making noises on the toilet'" in his cell, but no "motion-activated security video" shows Gallegos passing Ortiz' cell.  First Amended Complaint ¶¶ 171-72, at 24.  According to Gallegos, "Ortiz did not ask for medical assistance," and Gallegos "did not seek medical assistance for Mr. Ortiz on his own initiative."  First Amended Complaint ¶¶ 173-74, at 24.  At 8:20 a.m., "Officer Garcia reportedly approached Mr. Ortiz' cell and asked him 'if he was ok,'" but no "motion-activated security video" shows Garcia approaching Ortiz' cell.  First Amended

Complaint ¶¶ 175-76, at 24.  According to Garcia, in response to Garcia's question, Ortiz "motioned with his hand in a way that Officer Garcia interpreted as answering in the affirmative," but Ortiz did not verbally respond.  First Amended Complaint ¶ 178, at 24.

Ortiz died the morning of January 7, 2016.  See First Amended Complaint ¶ 192, at 25.  No "ADF staff or inmates witnessed Mr. Ortiz' final collapse."  First Amended Complaint ¶ 179, at 24.  When Garcia went to Ortiz' cell at 8:46 a.m. on January 7, 2016, he observed Ortiz "lying naked across his bed, 'with his body half off' the bed"; fluid that "looked brown" "all over the floor and walls"; Ortiz unresponsive while Garcia called his name thrice; and Ortiz not breathing.  First Amended Complaint ¶¶ 180-83, at 24.  Garcia "called a Code Red,[9] to which Lieutenant and Shift Commander Joshua Podlesny immediately responded," and Podlesny, "observing the position of Mr. Ortiz' body and puddles of blood around him, activated a Code Blue within the facility, to which a number of medical staff, including Nurse Kathleen Silva, responded."  First Amended Complaint ¶¶ 184-85, at 25.  Silva determined that Ortiz had no pulse and was not breathing, and, once other staff members moved Ortiz to the floor, Silva began performing chest compressions.  See First Amended Complaint ¶¶ 186-87, at 25.  Silva and other staff attempted to revive Ortiz with cardiopulmonary resuscitation ("CPR").  See First Amended Complaint ¶¶ 186-88, at 25.  "Efforts to start an IV in Mr. Ortiz' foot were unsuccessful."  First Amended Complaint ¶ 189, at 25.  Emergency Medical Services ("EMS") arrived at 9:02 a.m., and continued CPR and

---

[9]The Plaintiffs do not explain what constitutes a Code Red or a Code Blue at the ADF.  The Court is aware that hospitals often use both terms to "refer to a cardiopulmonary arrest."  Melissa Conrad Stoppler, What Does Code Blue, Code Black, and Code Red Mean?, MedicineNet, https://www.medicinenet.com/meaning_of_code_black_and_code_blue/views.htm (last visited Feb. 4, 2019).

other emergency medical measures including attempting to "run a rhythm strip," to determine if Ortiz had heart activity, until, at 9:08 a.m., EMS called Ortiz' death. First Amended Complaint ¶¶ 190-92, at 25.

At 9:30 a.m. on January 7, 2016, responding detectives arrived and found Ortiz "lying nude on his floor near his cell door," with "a pair of boxer shorts covered in blood and feces" near his feet. First Amended Complaint ¶¶ 193-94, at 25. Ortiz' body revealed no apparent injuries, "but blood trails were on his face, coming out of his mouth, his upper arms and shoulders, his rear end, and his lower legs and feet." First Amended Complaint ¶ 195, at 26. Ortiz' cell was covered with blood and feces, there were "'small pools of a liquid/reddish substance' on Mr. Ortiz' bed," "blood transfer stains on the wall at the head and left side of the bed," and a "'large pool of a dark brown/reddish liquid substance' . . . on the concrete floor to the right of the bed, and a drip trail of blood . . . under the bed." First Amended Complaint ¶¶ 196-98, at 26. There was "blood on the walls on the right side of the cell," "blood transfer stains near and below the cell's metal table," "blood and liquid feces inside and surrounding the toilet, and several blood stains on the toilet seat." First Amended Complaint ¶¶ 199-200, at 26. At 11:02 a.m., OMI pronounced Ortiz dead. See First Amended Complaint ¶ 201, at 26.

The March 8, 2016, OMI report concluded that Ortiz "died of an acute gastrointestinal hemorrhage due to probable heroin withdrawal." First Amended Complaint ¶ 202, at 26. The report found "significant bleeding throughout the gastrointestinal system"; "engorged blood vessels in Mr. Ortiz' esophagus" because of his esophageal lining tearing; bloody fluid in his airways "attributed to aspiration"; a fatty liver; and "scars and puncture marks on his arms

consistent with intravenous drug use." First Amended Complaint ¶¶ 203-206, at 26-27. The ADF staff speculated to investigators that Ortiz died as a "result of his being 'stuffed like a turkey' full of drugs," but the OMI report found no drugs or foreign objects in his body cavity, although he tested "presumptively positive" for opiates and anti-anxiety medications. First Amended Complaint ¶¶ 207, 209, at 27. The Medical Investigator opined that "it is very likely that because Mr. Ortiz used heroin steadily and abruptly stopped when he was incarcerated, that he had experienced symptoms of withdrawal, including vomiting." First Amended Complaint ¶ 210, at 27. The Medical Investigator explained that opiate heroin withdrawal "can begin within 12 hours of the last dose," that individuals dependent on heroin are at their "worst in the first 24-48 hours," and that withdrawal symptoms "can last for a week or more." First Amended Complaint ¶ 211, at 27. The Medical Investigator opined that "[s]ignificant vomiting from heroin withdrawal caused irritation and tearing of Mr. Ortiz' esophageal lining that resulted in 'bleeding into the stomach and intestines,' which resulted in his death." First Amended Complaint ¶ 212, at 27.

## PROCEDURAL BACKGROUND

In the First Amended Complaint, the Plaintiffs' contend that: (i) Santa Fe County and the individual Defendants negligently maintained and operated the ADF in violation of the NMTCA by failing to

> adopt and implement policies and procedures concerning employee training --
> including but not limited to medical intake nurse training -- which resulted in
> inmates in emergency medical situations, like Mr. Ortiz, not receiving proper
> medical evaluations (including relevant substance abuse evaluations and
> withdrawal assessments), and consequently being inappropriately placed,
> unmonitored, in the general inmate population of ADF while suffering from
> dangerous symptoms of heroin withdrawal.

First Amended Complaint ¶ 221, at 29; (ii) Santa Fe County and the individual Defendants

negligently maintained and operated the ADF in violation of the NMTCA by negligently classifying Ortiz in general population housing, negligently monitoring his withdrawal symptoms, negligently treating his withdrawal with a substandard kick kit that he may have never received, and negligently failing to refer him to the Medical Unit for observation and treatment, see First Amended Complaint ¶¶ 223-27, at 29-31; (iii) the individual Defendants violated 42 U.S.C. § 1983 by deliberately disregarding the known risk of serious medical harm to Ortiz, through inadequate intake, inappropriate housing placement, and inadequate monitoring and medical care, see First Amended Complaint ¶¶ 232-40, at 31-32; and (iv) Santa Fe County "is jointly and severally liable for all injuries and damages caused Mr. Ortiz by . . . the individual Defendants, pursuant to the doctrines of vicarious liability and *respondeat superior*," First Amended Complaint ¶ 230, at 31. The Defendants invoke the NMTCA's § 41-4-6 negligent-operation-of-a-building waiver and § 41-4-9 medical-facility waiver. See First Amended Complaint at 28 ("COUNT I: Plaintiffs' Claims Against All Defendants Under the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-6 and 41-4-9."). On January 15, 2018, the Defendants removed the suit to federal court under federal-question jurisdiction. See Notice of Removal under 28 U.S.C. § 1441 at 2, filed January 15, 2018 (Doc. 1). The Defendants filed the MTD on April 27, 2018. See MTD at 27.

1. **The MTD.**

The Defendants ask that the Court dismiss the Plaintiffs' NMTCA claims, because the Plaintiffs do not "allege facts falling within an existing waiver of immunity," and that the Court dismiss the Plaintiffs' § 1983 claims, because the individual Defendants "are entitled to qualified

immunity." MTD at 1. First, the Defendants contend that, because the Plaintiffs' NMTCA claims against the individual Defendants and some of the Plaintiffs' NMTCA claims against Santa Fe County depend on the individual Defendants' actions against a single inmate, Ortiz, the NMTCA's § 41-4-6 negligent-operation-of-a-building waiver does not apply. <u>See</u> MTD at 9-12 (citing <u>Kreutzer v. Aldo Leopold High Sch.</u>, 2018-NMCA-005, ¶ 53, 409 P.3d 930, 942, for the statement that the § 41-4-6 waiver's application requires that the negligent operation or maintenance create a dangerous condition which threatens the general public or a class of the building's users). According to the Defendants, the Court has stated that § 41-4-6 "does not waive a defendant's immunity when a plaintiff's claim is predicated on allegations of single, discrete actions affecting only a single detainee," and the Court has recognized that New Mexico courts have repeatedly held the same. MTD at 10 (citing <u>Gallegos v. Bernalillo Cty. Bd. of Comm'rs</u>, No. CIV 16-0127 JB/WPL, 2017 WL 3575883, at *43-44 (D.N.M. Aug. 17, 2017)(Browning, J.)("<u>Gallegos</u>"); <u>Archibeque v. Moya</u>, 1993-NMSC-079, ¶ 14 n.3, 866 P.2d 344, 349).

The Defendants argue that the First Amended Complaint's allegations that Santa Fe County negligently supervised and trained its employees, and failed to adopt "operational policies and procedures concerning medical intake training, orientation, placement and monitoring," do not suffice to waive immunity under § 41-4-6, because the § 41-4-6 waiver "does not apply to such negligent supervision or training claims" or to generalized allegations of inadequate safety policies, MTD at 12-14, and so the Plaintiffs' argument that Santa Fe County "negligently supervised and trained its employees by failing to adopt and inculcate reasonable and proper operational policies and procedures concerning the safety of" the ADF does not suffice to invoke

the § 41-4-6 waiver.  MTD at 13 (citing <u>Kreutzer v. Aldo Leopold High Sch.</u>, 2018-NMCA-005, ¶¶ 53, 66-77, 409 P.3d at 931-32, 945-48).  The Defendants summarize that the

> plaintiffs' generalized claims about a lack of operational policies and procedures concerning medical intake training, orientation, placement and monitoring, fall short of the factual allegations held to be determinative in *Upton*[ v. Clovis Municipal School District, 2006-NMSC-040, 141 P.3d 1259], such as the fact that the facility in *Upton* promised the decedent's parents that certain safety procedures would be provided to address a specific safety risk and then failed to implement the safety procedures.

MTD at 13 (citing <u>Kreutzer v. Aldo Leopold High Sch.</u>, 2018-NMCA-005, ¶ 72, 409 P.3d at 948).  The Defendants continue, arguing in response to the Plaintiffs' contention that the entire kick kit protocol the ADF follows is inadequate and poses a risk to all similarly situated inmates, because it lacks a methadone dose, the Court has previously concluded that the kick kit protocol is not "abjectly unsafe," and administering methadone or an alternative to an inmate is an individualized determination affecting only one person that does not suffice to waive immunity under § 41-4-6.  <u>See</u> MTD at 15-16 (quoting <u>Gallegos</u>, 2017 WL 3575883, at *43).

Second, addressing the Plaintiffs' § 41-4-9 allegations, the Defendants argue that the ADF is a jail, and not a "'hospital, infirmary, mental institution, clinic, dispensary, medical care home' or like facility," and none of the First Amended Complaint's factual allegations occurred in a medical facility.  MTD at 16 (quoting NMTCA § 41-4-9; and citing <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-085, ¶ 30, 187 P.3d 179, 185).  The Defendants state that "[t]here is no authority establishing that negligence claims based on medical conditions of inmates in the general population of a prison or jail fall under" the § 41-4-6 waiver.  MTD at 17.  The Defendants note that the First Amended Complaint makes no allegation about a medical facility, but that the Defendants "address the reference out of an excess of caution."  MTD at 16.

The Defendants next turn to the Plaintiffs' § 1983 claims against the individual Defendants, and aver that the individual Defendants are entitled to qualified immunity, warranting dismissal of the § 1983 claims against them. See MTD at 17. The Defendants assert that, under the United States Court of Appeals for the Tenth Circuit law,

> to survive a Rule 12(b)(6) motion to dismiss based on qualified immunity, a plaintiff must "nudge their claims across the line from conceivable to plausible, [by] alleg[ing] facts sufficient to show (assuming they are true) that the defendants plausibly violated [the plaintiff's] constitutional rights and that those rights were clearly established at the time."

MTD at 18 (alterations in MTD)(quoting Robbins v. Oklahoma, 519 F.3d 1242, 1249 (10th Cir. 2008)). In evaluating a qualified immunity claim, the Court must determine: (i) that the plaintiff's allegations, if true, state a claim for a violation of a constitutional right; and (ii) that the right was clearly established at the time that the defendant acted. See MTD at 18 (citing Bisbee v. Bey, 39 F.3d 1096, 1100 (10th Cir. 1994)). According to the Defendants, the Plaintiffs must show that Ortiz suffered an objectively serious medical harm -- here, the First Amended Complaint alleges that the harm is death as a result of an acute gastrointestinal hemorrhage -- and that the individual Defendants inferred that Ortiz faced the risk of the harm -- or that the risk was obvious to each of them -- and that they acted with deliberate indifference to the risk. See MTD at 18-20 (citing Martinez v. Beggs, 563 F.3d 1082, 1089-90 (10th Cir. 2009)). Regarding Robinson's alleged deliberate indifference, the Defendants argue that Ortiz exhibited no abnormal symptoms nor requested any particular medical treatment during the intake Robinson performed on January 4, 2016. See MTD at 21. The Defendants argue that the risk that Ortiz "would be at an imminent risk of death from a gastrointestinal hemorrhage during the intake, let alone several days later," was not obvious to Robinson during the intake and that caselaw requires plaintiffs to show that a

defendant faced "an imminent -- as opposed to a mere possibility -- of serious harm under such circumstances." MTD at 21 (citing Spencer v. Abbott, 731 F. App'x 731, 745 (10th Cir. 2017)(unpublished)[10]). The Defendants note that Robinson's intake "resulted in [Ortiz] being placed on the very protocol for handling [heroin withdrawal] within the ADF," and, that Robinson provided Ortiz with withdrawal medications and knew that Ortiz had begun the medications. MTD at 23. The Defendants argue that, although the Plaintiffs assert that Ortiz required more monitoring under a treatment plan than the intake recommended, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." MTD at 23 (citing Spencer v. Abbott, 731 F. App'x at 745). Further, the Defendants contend that Ortiz had no right to any particular course of treatment, see MTD at 23 (citing Callahan v. Poppel, 471 F.3d 1155, 1160 (10th Cir. 2006)), and that prison officials have no duty to constantly monitor inmates, see MTD at 23 (citing Gaston v. Ploeger, 229 F. App'x 702, 711

---

[10]Spencer v. Abbott is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Spencer v. Abbott, Gaston v. Ploeger, 229 F. App'x 702 (10th Cir. 2007)(unpublished), How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007), and duBois v. Payne Cty. Bd. of Cty. Comm'rs, 543 F. App'x 841 (10th Cir. 2013), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

(10th Cir. 2007)(unpublished)).

Regarding Chavez' and Lopez' alleged deliberate indifference, the Defendants aver that neither Chavez nor Lopez would have "perceived a potential risk of death to Ortiz," and that, according to the Defendants, Chavez and Lopez witnessed only heroin withdrawal symptoms. MTD at 23. The Defendants argue that "the burden is on the plaintiff to allege that these defendants had knowledge of an objective risk of harm of death to Ortiz from an acute internal hemorrhage or that the risk was obvious." MTD at 23 (citing Martinez v. Beggs, 563 F.3d at 1089-90). The Defendants allege that the Plaintiffs' allegations contradict any showing that Chavez and Lopez could have discerned that Ortiz was at an imminent risk of death when they encountered him, because the Plaintiffs allege "that following Mr. Ortiz' death, ADF staff had no idea that he had died from a hemorrhage related to his heroin withdrawal. The complaint alleges that staff mistakenly perceived that he died from concealing drugs in his body cavities." MTD at 24 (citing First Amended Complaint ¶ 207, at 27). The Defendants also argue that the fact that Chavez passed on Ortiz' report that he was throwing up blood to other staff contradicts allegations that Chavez acted with deliberate indifference. See MTD at 24.

Regarding Valdo's alleged deliberate indifference in classifying Ortiz into the general population at the ADF, the Defendants note that nothing suggests that Valdo would have concluded that Ortiz "was at an imminent risk of death from an acute hemorrhage on January 5th" or that Ortiz asked Valdo for medical assistance or for placement in the medical facility for medical care. MTD at 24. Regarding Garcia's and Gallegos' alleged deliberate indifference, the Defendants argue that Garcia and Gallegos knew that Ortiz was "undergoing heroin withdrawal," and appeared "unwell,"

but emphasize that Ortiz did not ask for medical assistance.  MTD at 25.  According to the Defendants, Garcia and Gallegos would not have known that Ortiz faced "risk of an imminent fatal hemorrhage," and the Defendants conclude that Garcia and Gallegos did not act with deliberate indifference to a known or obvious risk.  MTD at 25.  The Defendants contend that, although the Plaintiffs argue that Garcia and Gallegos did not check on Ortiz, even if they did not see Ortiz, that fact does not show Garcia's and Gallegos' deliberate indifference to Ortiz' medical needs.  MTD at 25. For the foregoing reasons, the Defendants ask that the Court dismiss the First Amended Complaint with prejudice and "grant the individual-capacity defendants' request for qualified immunity under Count II, and for all other appropriate relief."  MTD at 26.

2.      **The MTD Response.**

The Plaintiffs responded on August 13, 2018.  See Plaintiffs' Response to Defendants' Motion to Dismiss at 33, filed August 13, 2018 (Doc. 23)("MTD Response").  The Plaintiffs explain that they will seek leave to amend their First Amended Complaint,[11] which the Defendants

---

[11]The Plaintiffs state that their

proposed Second Amended Complaint includes, *inter alia*, information from experts describing how both of deceased Plaintiff Rick Ortiz' known medical conditions, opiate withdrawal and chronic Hepatitis C, would classify an incarcerated patient as high-risk and requiring medical intervention and close monitoring.  It further details new factual allegations relating to the Santa Fe County Adult Detention Facility's (ADF's) history of dangerously deficient intake medical screenings, assessments, referrals, and medical monitoring, as brought to light by the United States Department of Justice; contains numerous new allegations relating to several other, factually-similar, withdrawal-related deaths at ADF; and describes ADF's candid admission in internal investigation documents that its staff training, medical intakes, and emergency procedures are inadequate to prevent future withdrawal-related inmate deaths.

oppose, but contend that the First Amended Complaint, nevertheless, states a plausible claim upon which relief can be granted. <u>See</u> MTD Response at 1-2 & 1 n.3. The Plaintiffs note that they have "voluntarily dismissed their TCA claims against the individual Defendants." MTD Response at 15 n.3.

The Plaintiffs then address the Defendants' arguments about the NMTCA. <u>See</u> MTD Response at 16-21. The Plaintiffs first explain that their claims against Santa Fe County under the NMTCA's § 41-4-6's waiver turn on Santa Fe County's negligent maintenance of the ADF by its failure to train employees to provide proper medical attention for withdrawal. <u>See</u> MTD Response at 16. The Plaintiffs argue that this failure is shown throughout Ortiz' history with the ADF of inadequate evaluations and monitoring, and the ADF's "pattern of failing to follow its own medical intake guidelines." MTD Response at 16. The Plaintiffs aver that the pleading standards "do not require a plaintiff to plead facts describing injuries to multiple individuals in order to pass muster under § 41-4-6." MTD Response at 17 (citing <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040, 141 P.3d 1259). Second, regarding the Defendants' contention that the Plaintiffs allege a claim "purely for negligent supervision and training," the Plaintiffs argue that the line between supervision and training, and maintaining a public building, are blurring and that the Plaintiffs' claims, like those in <u>Upton v. Clovis Municipal School District</u>, are "part and parcel of the dysfunctional system" at the ADF. MTD Response at 20. <u>See</u> MTD Response at 19-20. Last, the Plaintiffs aver that, contrary to the Defendants' § 41-4-9 arguments, <u>Lessen v. City of Albuquerque</u> "stands for the proposition that a government entity does not waive sovereign immunity where a

MTD Response at 1-2.

private medical contractor, rather than the government entity, operated the medical unit of a correctional facility." MTD Response at 21 (citing <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-085, ¶ 31, 187 P.3d at 185). The Plaintiffs contend that they have stated a claim under § 41-4-9, because the ADF, and not a private contractor, "operated and maintained the Medical Intake Unit," and the Medical Unit's employees acted negligently. MTD at 21.

Next, the Plaintiffs turn to the claims against the individual Defendants under § 1983. <u>See</u> MTD at 22. The Plaintiffs contend that the individual Defendants need not have known that Ortiz faced the risk of an acute internal hemorrhage, but rather, that they need have known only that Ortiz was at risk because of a "severe, life-threatening illness." MTD Response at 24. The Plaintiffs argue that they need show only that "Mr. Ortiz' symptoms 'constituted sufficient harm in themselves to satisfy the objective component.'" MTD Response at 29 (quoting <u>Mata v. Saiz</u>, 427 F.3d 745, 753 (10th Cir. 2005); <u>Sealock v. Colorado</u>, 218 F.3d 1205, 1209 (10th Cir. 2000)).

Regarding Robinson's alleged deliberate indifference, the Plaintiffs argue that Robinson was aware that Ortiz would suffer heroin withdrawals and had Hepatitis C, and that this combination of factors should have alerted her to a severe risk to Ortiz' health. <u>See</u> MTD Response at 25. The Plaintiffs argue that another inmate with Ortiz in the Medical Intake Unit observed that Ortiz was ill during Robinson's intake, and that, the "serious risk of significant harm" to Ortiz at the time of Robinson's intake "should have been obvious to any layperson, let alone a nurse." MTD Response at 25. The Plaintiffs allege that there is ample evidence to satisfy that Robinson was subjectively deliberately indifferent to Ortiz' risks, where she

> failed at adhering to any of ADF's guidelines for conducting a medical intake -- she did not conduct an initial assessment "for predictors of severe withdrawal" at the

initial review, let alone reassess Mr. Ortiz' symptoms two hours later, as the guidelines mandated; falsely stated on Mr. Ortiz' Intake History that Mr. Ortiz did not suffer from any chronic illnesses or conditions; did not perform a required COWS assessment, let alone order follow-up monitoring; did not inquire as to the nature and extent of Mr. Ortiz' illness when he stopped using drugs; did not list his symptoms, despite his obvious illness, as attested to by a witness; did not identify any medical restrictions or potential complications; did not assess him for an opiate overdose or note his last use of opioids; left entirely blank a required "treatment plan," which required her to assess whether Mr. Ortiz should be housed in the Medical Unit and whether he had a history of illicit opioid use, and to refer him for overdose training and COWS evaluations; totally ignored an additional form requiring her to complete an "Opioid Withdrawal Assessment" for Mr. Ortiz; and then decided to place Mr. Ortiz in the general inmate population without providing for any additional medical assistance or follow-up evaluations . . . .

MTD Response at 26 (citations omitted). The Plaintiffs argue that Robinson's several omissions in the intake process outweigh that she arranged for Ortiz to receive a kick kit -- and the Plaintiffs allege that Ortiz never received the kick kit. See MTD Response at 25-26. Further, the Plaintiffs aver that the Tenth Circuit has held that a corrections officer who acts "solely . . . as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." MTD Response at 27 (quoting Mata v. Saiz, 427 F.3d at 751 (internal quotation marks omitted)).

Regarding Chavez' alleged deliberate indifference, the Plaintiffs contend that Chavez' "objective awareness" of Ortiz' heroin withdrawal and bloody vomit should have alerted him to Ortiz' serious medical condition, and that Chavez' failure to take any action -- such as preparing a report or obtaining Ortiz immediate medical assistance -- in response to these facts, beyond updating the next group of corrections officers at the end of his shift, constituted deliberate indifference. MTD Response at 27-28. Regarding Valdo's alleged deliberate indifference, the Plaintiffs allege that, when Valdo met with Chavez, Valdo learned of Ortiz' heroin withdrawal and

severely ill appearance, and that these facts would alert any layperson to Ortiz' risk of serious medical harm.  See MTD Response at 28.  The Plaintiffs note that by not sending Ortiz to the Medical Unit for assistance, Valdo, whom the ADF employed to make proper housing classifications, acted with deliberate indifference to Ortiz' risk.  See MTD Response at 28-29. Regarding Lopez' alleged deliberate indifference, the Plaintiffs argue that Lopez, like Valdo and Chavez, was aware of Ortiz' symptoms and should have been alerted to the risk, and that Lopez took no action to aid Ortiz.  See MTD Response at 29.  Regarding Gallegos' alleged deliberate indifference, the Plaintiffs allege that Gallegos likewise observed Ortiz' symptoms and, given that Gallegos observed Ortiz soon before his death and the state of Ortiz' cell at his death, Ortiz' need for medical attention would have been obvious.  See MTD Response at 30.  The Plaintiffs aver that Gallegos' failure, like the other individual Defendants' failure, to obtain medical attention for Ortiz constitutes deliberate indifference.  See MTD Response at 30.  Last, the Plaintiffs contend that, because Garcia stated that he observed Ortiz twenty-six minutes before finding the body, the same arguments for Gallegos' deliberate indifference apply to Garcia's actions.  See MTD Response at 30-31.  The Plaintiffs conclude by asking that, if the Court decides that the First Amended Complaint does not state a claim, the Court grant the Plaintiffs leave to amend the First Amended Complaint, stating that the Plaintiff's Proposed Second Amended Complaint "further develops each of their existing claims, is not futile, was not brought in bad faith, will not prejudice the Defendants, and is not the result of undue delay."  MTD Response at 31-32.

3.      **The MTD Reply.**

The Defendants replied on October 12, 2018.  See Defendants' Reply Brief in Support of

Motion to Dismiss at 15, filed October 12, 2018 (Doc. 33)("MTD Reply").  The Defendants state that they reply to the MTD Response and reserve their arguments about the MTA for the Defendants' Response Opposing Plaintiffs' Motion to Amend the Complaint [Doc. 30], filed October 12, 2018 (Doc. 34)("MTA Response").  MTD Reply at 1.  The Defendants reiterate that the First Amended Complaint does not state a "cognizable claim for negligence under the New Mexico Tort Claims Act," and that, furthermore, "the individual Defendants are entitled to qualified immunity."  MTD Reply at 2.  The Defendants acknowledge the Plaintiffs' withdrawal, which the Plaintiffs articulate in a footnote, of their NMTCA claims against the individual Defendants.  See MTD Reply at 2.  The Defendants repeat their arguments -- that the Plaintiffs make allegations about discrete medical and administrative decisions affecting a single inmate, or about negligent supervision and training -- why the Plaintiffs' claims against Santa Fe County do not satisfy the requirements for § 41-4-6(A)'s sovereign immunity waiver.  See MTD Reply at 2-3.  The Defendants note that the Plaintiffs do not respond to the Defendants' argument that Kreutzer v. Aldo Leopold High School "reaffirmed that § 41-4-6 does not encompass negligence claims based on a lack of supervision of employees and that generalized allegations concerning inadequate safety policies as well as alleged failure to follow such policies do not fall within the scope of the waiver."  MTD Reply at 3.  The Defendants indicate that the Plaintiffs' allegations about Ortiz' time at the ADF before the January, 2016, incarceration do not allege a pattern "of performing inadequate medical intake evaluations and monitoring of inmates withdrawing from heroin use," MTD Reply at 6 (quoting MTD Response at 19), because, during those incarcerations, there are no allegations that Ortiz was withdrawing from heroin or in need of medical attention,

see MTD Reply at 4-7.

Regarding the § 41-4-9 waiver, the Defendants argue that no caselaw applies the § 41-4-9 waiver to a jail's intake facility, and that the First Amended Complaint contains no allegation that the ADF's medical intake unit "is similar to a hospital, infirmary, mental institution, clinic, dispensary, medical care home, or like facilities." MTD Reply at 7-8. The Defendants contend that "[t]he fact that a detention center employee conducts a medical intake of detainees does not fit within the definition of 'medical facilities' that admit patients and provide medical care." MTD Reply at 8 (quoting NMTCA § 41-4-9). The Defendants contend that the Plaintiffs may not rely on the § 41-4-9 immunity waiver and ask that the Court dismiss their negligence claim "for this reason." MTD Reply at 8.

Regarding the Plaintiffs' § 1983 claims, the Defendants first allege that the Plaintiffs have not established a basis for a plausible allegation of a constitutional right violation. See MTD Reply at 8. Although Robinson "does not dispute for the purposes of this motion" the allegation that Ortiz indicated that he anticipated experiencing heroin withdrawal during his incarceration, the Defendants contend that the First Amended Complaint does not allege that he experienced withdrawal symptoms during his encounter with Robinson. MTD Reply at 8. The Defendants argue that the allegation another inmate observed Ortiz looking sick during intake does not suffice to show Robinson recognized or should have recognized "an exigent serious medical need." MTD Reply at 8. The Defendants contend that the Plaintiffs have not met the requirement of showing that Robinson drew the inference "that Ortiz was at an immediate risk of harm or death when she encountered him during the intake." MTD Reply at 9. The Defendants also argue that Robinson

was not deliberately indifferent when she demonstrated clear intent to care for Ortiz' anticipated withdrawal symptoms by evaluating him and placing him on opioid withdrawal protocol.  See MTD Reply at 9 (quoting Spencer v. Abbott, 732 F. App'x at 741-47; Self v. Crum, 439 F.3d 1227, 1233 (10th Cir. 2006)).  The Defendants argue that Robinson could not have been deliberately indifferent to Ortiz' escalating medical needs when she had no further involvement with Ortiz during the days in which his symptoms worsened and absent allegations that she "acquired any additional information . . . that [Ortiz] had either refused or not received medications, that he had any different symptoms, or that any other similar events occurred."  MTD Reply at 10.

The Defendants contend that, pursuant to McGarry v. Board of County Commissioners, 294 F. Supp. 3d 1170 (D.N.M. 2018)(Browning, J.), the Plaintiffs bear the burden of proving the law violated was clearly established at the time of the events.  See MTD at 10 (citing McGarry v. Bd. of Cty. Comm'rs, 294 F. Supp. 3d at 1199-1200).  The Defendants argue that no Tenth Circuit caselaw recognizes a timeline as attenuated as that from Robinson's intake to Ortiz' death as a basis for deliberate indifference to medical needs claims.  See MTD Reply at 11.  The Defendants argue that, for the foregoing reasons, Robinson is entitled to qualified immunity.  See MTD Reply at 11.

The Defendants argue that the individual Defendants are also entitled to qualified immunity.  See MTD Reply at 11.  The Defendants argue that detention officers who are not medical providers, such as the individual Defendants, are entitled to defer to the professional medical judgment of the ADF's medical personnel in placing Ortiz on the opioid withdrawal protocol.  See MTD Reply at 11-12.  The Defendants allege that the question for the purposes of

the § 1983 claim is whether it was obvious to each individual Defendant "that the protocol that the medical staff had implemented to deal with those withdrawal symptoms was ineffective and that Ortiz had an obvious serious medical need that medical staff had not addressed." MTD Reply at 12. The Defendants argue that Ortiz did not request medical assistance from any of the individual Defendants, and that the First Amended Complaint raises no allegations that any of the individual Defendants actually drew the inference that Ortiz had a serious medical need that the ADF's medical personnel did not previously address. See MTD Reply at 12-14. The Defendants request, for the foregoing reasons, that the Court dismiss the case with prejudice and determine that the individual Defendants are entitled to qualified immunity. See MTD Reply at 14. The Defendants also attach a copy of a blank COWS form. See MTD Reply at 17-18.

### 4. **The MTA.**

The Plaintiffs filed the MTA on September 12, 2018. See MTA at 17. The Plaintiffs note that, on July 11, 2018, the Defendants stated that they opposed an earlier version of the Second Amended Complaint, not filed with the Court. See MTA at 1. The Plaintiffs explain that, although the Defendants have not stated their position on the Second Amended Complaint's current version, the Plaintiffs assume that the Defendants oppose it. See MTA at 1; Proposed Second Amended Complaint at 1.

The Plaintiffs summarize the factual allegations in the Proposed Second Amended Complaint. See MTA at 2-5. The Plaintiffs state that they add language describing the ADF's Medical Unit as "an infirmary- or clinic-like facility within the meaning of NMSA 1978 § 41-4-9." MTA at 2 (quoting Proposed Second Amended Complaint ¶ 4, at 3). The Plaintiffs state that

they further explain that the co-occurrence of opiate addiction and Hepatitis C makes a patient high-risk, and in need of medical attention and monitoring; and that correctional facilities' failures to monitor opiate withdrawal patients have led to "numerous" deaths "in the past five years," MTA at 3 (quoting Proposed Second Amended Complaint ¶¶ 113-14, at 17); and that Dr. Homer Venters, "a national expert in providing health services to the incarcerated, former Medical Director and Chief Medical Officer of New York City's Jail Correctional Health Service, and current Director of Programs for Physicians for Human Rights," opines that Robinson, as a "licensed medical nurse," should have recognized that not referring an inmate suffering from opiate withdrawal, particularly combined with Hepatitis C, would "expose the inmate to the substantial risk of serious harm, including the risk of death," MTA at 3 (quoting Proposed Second Amended Complaint ¶ 115, at 18). The Plaintiffs state that they discuss how the ADF's opiate withdrawal protocol is "below the standard of care," which they identify as the MAT protocol that the Bernalillo County Metropolitan Detention Center in Albuquerque, New Mexico ("MDC") uses -- a protocol which includes the use of methadone. MTA at 3 (quoting Proposed Second Amended Complaint ¶¶ 127-32, at 19-20).

The Plaintiffs indicate that they allege that the ADF trained Chavez to recognize when inmates require immediate or emergency medical attention, including vomiting blood, and that vomiting blood is obvious even to a layperson as an emergent medical need, and that, if Chavez did not receive such training, "this would constitute evidence of [the ADF's] failure to train its corrections officers" adequately. MTA at 3 (quoting Proposed Second Amended Complaint ¶ 140 & n.1, at 21). The Plaintiffs state that they include language making more "explicit" that Valdo

had access to Ortiz' "inmate records" and was aware of Ortiz' Hepatitis C diagnosis, and that Valdo, "as an experienced classification officer," knew that Ortiz "was in need of immediate medical assistance and at risk of serious medical harm." MTA at 3 (quoting Proposed Second Amended Complaint ¶¶ 145, 147-48, at 22). Further, the Plaintiffs state that they "make more explicit" that Lopez , as an experienced corrections officer presumably trained to recognize signs of need for immediate medical attention, and who reviewed Ortiz' intake information and observed Ortiz exhibiting withdrawal symptoms, would have been aware of the medical risks to Ortiz and acted without regard to that risk. MTA at 3-4 (quoting Proposed Second Amended Complaint ¶¶ 170-74, at 25).

The Plaintiffs explain that they similarly emphasize and "make explicit" allegations that Garcia and Gallegos should have been aware of the risk to Ortiz, and did not act to counteract that risk, and that the Plaintiffs add language alleging that, if Garcia did not monitor Ortiz, Garcia failed to monitor an inmate at risk of medical harm, which aligns with the ADF's practice of not adequately monitoring the inmates. MTA at 4 (quoting Proposed Second Amended Complaint ¶¶ 185-86, 190-94, 199-201, at 26-29). The Plaintiffs indicate that they rewrite "a factual allegation about which Defendants are apparently confused," and explain that they clarify that the ADF staff blamed Ortiz' death on Ortiz' smuggling drugs into the ADF rather than blaming it on the ADF's negligence. MTA at 4 (citing Proposed Second Amended Complaint ¶ 230, at 31). According to the Plaintiffs, they also add allegations describing "a 2002-2003 U.S. Department of Justice [('DOJ')] investigation into conditions at the ADF," in which the DOJ concluded in a report (the "2003 DOJ Report") that the ADF provided insufficient medical attention and screening to

inmates, and that the ADF did not "properly refer" inmates suffering from life-threatening opiate withdrawal for medical assistance. MTA at 4-5 (citing Proposed Second Amended Complaint ¶¶ 237-43, at 32-34).

The Plaintiffs explain that they also include allegations about "three withdrawal-related inmate deaths [at the ADF] in 2015 and 2016." MTA at 5 (citing Proposed Second Amended Complaint ¶¶ 244-256, at 34-36). The Plaintiffs detail that these deaths included: (i) Dr. Thomas Pederson's death from alcohol withdrawal after the ADF failed to "complete intake documentation," to "perform critical assessments that would have triaged Dr. Pederson into the medical unit," and to properly "train its medical staff;" (ii) John DeLaura's death from alcohol withdrawal after the ADF did not provide adequate medical intake, assessment, or attention; and (iii) Stacy Lynn Gambler's death from alcohol withdrawal after the ADF did not monitor her regularly or provide appropriate medical attention. MTA at 5 (citing Proposed Second Amended Complaint ¶¶ 244-56, at 34-36). The Plaintiffs add that they also include allegations about the ADF's failure to protect other inmates from harm, resulting in Dickie Ortega's 2004 death "by beating" and Thomas Wayne Ferguson's 2018 death "by suicide." MTA at 5 (citing Proposed Second Amended Complaint ¶¶ 257-58, at 36).

The Plaintiffs also summarize the changes that the Proposed Second Amended Complaint makes to their claims. See MTA at 5-6. The Plaintiffs note that they eliminate their NMTCA claims against the individual Defendants. See MTA at 5. The Plaintiffs explain that they add paragraphs to Count I, which details their claims against Santa Fe County under the NMTCA, describing the ADF's pattern of failing to provide adequate medical attention and monitoring to

inmates by detailing Ortiz' history with the ADF; the ADF's previous failures to attend to Ortiz' medical situation; and Dr. Pederson's, DeLaura's, and Gambler's deaths. See MTA at 5-6 (citing Proposed Second Amended Complaint ¶¶ 270-72, at 39-40). The Plaintiffs also describe that they partially rewrite the paragraphs in Count II which state the Plaintiffs' claims against the individual Defendants, but that the factual allegations in those paragraphs are identical to those in the First Amended Complaint. See MTA at 6 (citing Proposed Second Amended Complaint ¶¶ 284-88, at 42-43). The Plaintiffs indicate that they add a Count III, which "sets forth a *Monell*[ v. Department of Social Services of New York City, 436 U.S. 658 (1978)("Monell"),] claim against Santa Fe County" based on the ADF's customs and practices of deliberate indifference to inmates' "serious medical needs," particularly the needs of inmates suffering withdrawal. MTA at 6 (quoting Proposed Second Amended Complaint ¶¶ 290-95, at 44-45). The Plaintiffs point to Ortiz' history at the ADF, and Dr. Pederson's, DeLaura's, and Gambler's deaths, as evidence for the claim. See MTA at 6 (citing Proposed Second Amended Complaint ¶¶ 293-95, at 44-45). The Plaintiffs also indicate that they add a § 1983 failure-to-train theory against the ADF for the ADF's failure to train Robinson in proper intake methods, and its failure to train Chavez, Valdo, Lopez, Garcia, and Gallegos to obtain medical attention for inmates suffering withdrawal. See MTA at 6 (citing Proposed Second Amended Complaint ¶¶ 296-99, at 46-47).

The Plaintiffs argue that the Court should grant them leave to amend the First Amended Complaint. See MTA at 1. The Plaintiffs contend that they make the amendments in good faith, because they add information that they have obtained since filing the First Amended Complaint and they attempt to resolve the Defendants' "various issues with" the First Amended Complaint.

MTA at 6-7. The Plaintiffs contend that the amendments are not "the result of undue delay or dilatory motive," when "all deadlines have been either vacated or have yet to be set," and the Honorable Laura J. Fashing, United States Magistrate Judge for the District of New Mexico, granted the Defendants' Unopposed Motion to Stay, filed April 30, 2018 (Doc. 14)("Motion to Stay")(requesting the Court to stay discovery and other proceedings pending the MTD's resolution). MTA at 8. See Order Granting Unopposed Motion to Stay, filed April 30, 2018 (Doc. 15)("Order Granting Stay"). The Plaintiffs contend that the amendments do not prejudice the Defendants, because many of the amendments "merely summarize or seek to better clarify their existing factual allegations from the operative First Amended Complaint," and, because, one of the amendments pertains to the Plaintiffs' "decision to drop their TCA claims against all of the individual Defendants." MTA at 10. The Plaintiffs contend that, to the extent there are new substantive allegations, they do not pertain specifically to Ortiz, they arise out of the same subject matter as the First Amended Complaint, and the Defendants will have ample time to investigate them, as "discovery in this case has yet to even begin." MTA at 11. The Plaintiffs further contend that the amendments are not futile. See MTA at 11-17. The Plaintiffs argue that their amended Count I alleges that "on eight separate occasions over a three-year period, ADF established a persistent pattern of performing inadequate medical intake evaluations and follow-up monitoring of a class of users of the building, inmates withdrawing from chronic drug use, as evidenced by the numerous experiences of Mr. Ortiz." MTA at 12 (citing Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, 141 P.3d 1259; C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d 1344 (D.N.M. 2012)(Browning, J.)). The Plaintiffs contend that the amended Count I enhances the

existing NMTCA claim against the ADF by noting the ADF's repeated failure to provide appropriate medical attention to inmates and describing that this failure has continued since the 2003 DOJ Report, which examined and labeled the failure unconstitutional.  See MTA at 12-14.  The Plaintiffs note that Count II in the Proposed Second Amended Complaint contains no substantive amendments to Count II in the First Amended Complaint.  See MTA at 14.  Last, the Plaintiffs aver that the newly added Count III sets forth a claim under Monell, because it shows that the ADF followed customs and practices of "deliberate indifference to inmates' serious medical needs."  MTA at 14 (quoting Proposed Second Amended Complaint ¶ 292, at 44).  The Plaintiffs argue that the allegations about the DOJ investigation; Dr. Pederson's, DeLaura's, and Gambler's death; and Ortiz' experiences in the ADF support their argument that the ADF has a culture of deliberate indifference towards inmates' medical needs.  See MTA at 15.  The Plaintiffs explain that they support their failure-to-train theory under Monell with Robinson's lack of training regarding intake and with the lack of training of the intake nurse who assessed Dr. Pederson.  See MTA at 15-16.  Further, the Plaintiffs allege that Chavez', Valdo's, Lopez', Garcia's, and Gallegos' failure to get Ortiz medical attention show that the ADF failed to train its staff to obtain medical attention for inmates suffering withdrawal.  See MTA at 16.

5.      **The MTA Response.**

On October 12, 2018, the Defendants responded to the MTA.  See MTA Response at 19.  The Defendants note that the question for the Court is whether the Proposed Second Amended Complaint states a claim upon which relief can be granted and argue that it does not.  See MTA Response at 1-2.  The Defendants reiterate their arguments from the MTD that the Plaintiffs do

not state a claim under § 41-4-6. <u>See</u> MTA Response at 2-3. The Defendants contend that decisions regarding Ortiz' classification and treatment represent discrete administrative decisions about a single inmate, and do not trigger the § 41-4-6 immunity waiver. <u>See</u> MTA Response at 2-3. The Defendants argue that, following <u>Kreutzer v. Aldo Leopold High School</u>, "merely claiming that the alleged negligence derives from deficiencies in training, monitoring or supervision similarly does not bring such claims within the applicable waiver." MTA Response at 3.

The Defendants also argue that the Plaintiffs' additional allegations about the DOJ investigation and an alleged systematic problem at the ADF do not state a claim that Ortiz' death resulted from negligent operation of a building as the NMTCA defines that phrase, because the DOJ investigation occurred while private corporations and contractors managed the ADF's medical unit, the DOJ's case was dismissed in 2009, after Santa Fe County's "substantial compliance with the terms of the settlement agreement," and the DOJ investigation occurred thirteen to fourteen years before Ortiz' incarceration at the ADF. MTA Response at 4-5. The Defendants also argue that Ortega's death occurred fourteen years before Ortiz' incarceration and is unrelated to Ortiz' death. <u>See</u> MTA Response at 5. The Defendants similarly contend that Dr. Pederson's death from alcohol withdrawal is unrelated to Ortiz' opiate withdrawal or to "management of opioid-dependent detainees," as "it is not clear that Pederson actually died from complications of withdrawal," and that Dr. Pederson was seen in an emergency room and "not housed in the medical unit" on the evening of the incident, "due to the lack of an available bed." MTA Response at 5. The Defendants note that Gambler, unlike Ortiz, "was assigned to the medical unit," and that her death is unrelated to Ortiz' death. MTA Response at 5. According to

the Defendants, DeLaura's death from alcohol withdrawal complications and Ferguson's death by suicide occurred after Ortiz' death, and neither death relates to intake decisions for inmates suffering opioid withdrawal.  See MTA Response at 6.

Regarding the Plaintiffs' claim under § 41-4-9, the Defendants note that "merely applying a label to the so-called medical unit does not frame the case within the parameters of the NMTCA." MTA Response at 7.  The Defendants contend that Bell Atlantic v. Twombly, 550 U.S. 544 (2007), must mean that merely applying a conclusory label absent allegations of plausible facts is insufficient to state a claim.  See MTA Response at 7.  The Defendants repeat their argument that the ADF's medical intake unit "may well assist in identifying conditions and circumstances that might require medical treatment at a medical facility," and that the medical intake unit does not -- unlike the facilities that qualify as medical facilities for § 41-4-9's purposes -- provide medical care and treatment to inmate patients.  MTA Response at 7-8.

Finally, the Defendants contend that the Plaintiffs' Monell claim "is futile."  MTA Response at 8.  The Defendants argue that the Plaintiffs do not identify a "specific policy or practice" that is unconstitutional.  MTA Response at 12.  The Defendants aver that, to succeed under Monell, the Plaintiffs must establish an "official municipal policy," such as "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  MTA Response at 12 (citing Connick v. Thompson, 563 U.S. 51, 60-61 (2011)).  The Defendants contend that plaintiffs can also show the existence of a custom when they can show:

> (1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the [municipality's] employees;

(2) Deliberate indifference to or tacit approval of such misconduct by the [municipality's] policymaking officials after notice to the officials of that particular misconduct; and

(3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to the [municipality's] custom and that the custom was the moving force behind the unconstitutional acts.

MTA at 13 (alterations in MTA)(quoting Gates v. Unified Sch. Dist. No. 449, 996 F.2d 1035, 1041 (10th Cir. 1993)).  According to the Defendants, "Monell's deliberate indifference standard may be satisfied when the municipality has 'notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm.'" MTA Response at 13 (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1999)).  The Defendants contend that the DOJ investigation, and DeLaura's and Ferguson's deaths, occurred too long before and after Ortiz' death to meet the notice requirement, and that Gambler's and Dr. Pederson's deaths, both involving alcohol withdrawal, did not provide notice about the ADF's customs regarding opiate withdrawal treatment.  See MTA Response at 14-15.  The Defendants argue that the "sheer number of" inmates suffering opioid withdrawal and the Plaintiffs' failure to identify a single other opioid withdrawal case shows "there is not a continuing, persistent and widespread practice of unconstitutional misconduct related to the management of opioid dependency."  MTA Response at 15.  The Defendants further contend that no evidence shows that Santa Fe County's indifference to opiate withdrawal was related to Ortiz' death, "days after his intake," from "emergent hemorrhage."  MTA Response at 15.

The Defendants argue that the Plaintiffs do not allege that training related to Dr. Pederson's or Gambler's deaths, and so the Plaintiffs do not allege "a pattern of similar constitutional violations by untrained employees," "notice to any particular County decision maker that

employees were committing constitutional violations due to lack of training," or "any deliberate indifference by any County authority concerning choices in implementing a training regimen." MTA Response at 16-17 (citing <u>Connick v. Thompson</u>, 563 U.S. at 61; <u>City of Canton v. Harris</u>, 489 U.S. 378, 395 (1989); <u>Bd. of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 409 (1997); <u>Bryson v. City of Okla. City</u>, 627 F.3d 784, 788 (10th Cir. 1996)).

**6.    The MTA Reply.**

On December 11, 2018, the Plaintiffs replied.  <u>See</u> Plaintiffs' Reply to Defendants' Response Opposing Plaintiffs' Motion to Amend the Complaint at 14, filed December 11, 2018 (Doc. 39)("MTA Reply").  First, the Plaintiffs repeat that Ortiz' history with the ADF shows a "cognizable claim under § 41-4-6."  MTA Reply at 4.  The Plaintiffs further argue that they state a claim under § 41-4-6, because the DOJ investigation demonstrates that the ADF was on notice of the deficiencies in its medical attention; Dr. Pederson's, Gambler's and DeLaura's deaths show a failure to assess, monitor, and refer to medical attention inmates experiencing drug withdrawals; and Dr. Pederson's death resulted from the ADF's admitted failure to train its nurses, review medical records, properly complete intake, or assess Dr. Pederson.  <u>See</u> MTA Reply at 5-7.

Second, the Plaintiffs argue that "this Court recently rejected a § 41-4-9 claim involving a jail's medical unit because 'liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services,' *not* because a 'jail is not a medical facility,' in Defendants' oft-repeated phrase."  MTA Reply at 8 (emphasis in MTD Reply)(quoting <u>Salazar v. San Juan Cty. Det. Ctr.</u>, No. CIV 15-0417 JB/LF, No. CIV 15-0439 JB/LF, No. CIV 15-0497 JB/LF, No. CIV 15-0526 JB/LF, 2016 WL 335447, at *49 (D.N.M. Jan. 15,

2016)(Browning, J.)).  The Plaintiffs assert that the Medical Intake Unit "functions as 'a clinic-like environment,' by virtue of the fact that 'inmates are [being] medically evaluated' there."  MTA Reply at 8 (quoting Second Amended Complaint ¶ 4, at 260).

The Plaintiffs next note that, in the MTA Response, the "Defendants do not dispute that Plaintiffs' amendments to Count II set forth a cognizable § 1983 claim," and so the Court should allow that claim to proceed.  See MTA Reply at 8.  Last, the Plaintiffs reply to the Defendants' attack on their Monell claim by arguing that no caselaw supports that events postdating the main factual allegations cannot evidence "a widespread custom of deliberate indifference" when the events are based on "the same kind of municipal misconduct."  MTA Reply at 11.  The Plaintiffs also object to the Defendants' focus on drug versus opioid withdrawals, and contend that the ADF failed to address both drug and alcohol withdrawals properly.  See MTA Reply at 11.  Regarding their failure-to-train theory, the Plaintiffs contend that Robinson's lack of training on intake and poor intake for Ortiz; Dr. Pederson's death; the ADF's admission that the intake nurses received no orientation regarding intake procedures and did not properly intake Dr. Pederson; and an ADF internal investigation document determining that the ADF should improve orientations of intake nurses to avoid inmate deaths state a cognizable claim regarding the ADF's failure to train its nurses and a "deliberate indifference to withdrawing inmates' Fourteenth Amendment rights."  MTA Reply at 11-12.  The Plaintiffs contend that Dr. Pederson's, DeLaura's, Gambler's, and Ortiz' deaths resulted from improper monitoring by the ADF's staff of inmates suffering withdrawal and shows a failure to train such employees to obtain medical attention for withdrawing inmates.  See MTA Reply at 12.  In response to the Defendants' argument about

decisionmakers' notice of such problems, the Plaintiffs argue that they need not identify at the pleading stage "how and when County decisionmakers learned of a problem so widespread as to be obvious" and that, particularly given a high-profile death, like Dr. Pederson's death, "it appears ludicrous on its face that County decisionmakers would *not* be aware of a training deficiency." MTA Reply at 13 (emphasis in original).

### LAW REGARDING AMENDING THE PLEADINGS BEFORE TRIAL

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a). Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading. Rule 15(a) provides:

(a)     **Amendments Before Trial.**

    (1)     **Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:

        (A)     21 days serving it, or

        (B)     if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

    (2)     **Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

    (3)     **Time to Respond.**  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a). Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires. See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Co-op., No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.). The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Foman v. Davis, 371 U.S. 178, 182 (1962). Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001). See also In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile." Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. An amendment is "futile" if the pleading, "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).

"The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

If a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s requirements, he or she must satisfy rule 16(b)(4)'s good-cause requirement. See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th Cir. 2014)(Matheson, J.)("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard."). Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240. The rule "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)("Properly construed, 'good cause' means that scheduling deadlines cannot be

met despite a party's diligent efforts."). See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1209-11 (D.N.M. 2011)(Browning, J.)(same).

The Court has previously stated that its rule 16(b) good-cause inquiry focuses on the diligence of the party seeking to amend the scheduling order. See Walker v. THI of N.M. at Hobbs Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. 08-1101, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29, 2009)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., Nos. 02-1146 and 03-1185, 2007 WL 2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.). The United States District Court for the District of South Carolina has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts. In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

Dilmar Oil Co., Inc. v. Federated Mut. Ins., 986 F. Supp. 959, 980 (D.S.C. 1997)(Currie, J.) (citations omitted), aff'd, 129 F.3d 116 (4th Cir. 1997). See Denmon v. Runyon, 151 F.R.D. 404, 407 (D. Kan. 1993)(O'Connor, J.)(affirming an order denying the plaintiff's motion to amend after the deadline which the scheduling order established had passed and stating that, "[t]o establish 'good cause,' the party seeking to extend the deadline must establish that the scheduling order's deadline could not have been met with diligence"). Cf. SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d

1507, 1518-19 (10th Cir. 1990)(affirming, under rule 16(b), denial of a motion to amend an answer

to include a compulsory counterclaim filed three months after the scheduling order deadline).

In In re Kirkland, 86 F.3d 172 (10th Cir. 1996), the Tenth Circuit dealt with the definition

of "good cause" in the context of rule 4(j).[12]  The Tenth Circuit noted:

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it
> would appear to require at least as much as would be required to show excusable
> neglect, as to which simple inadvertence or mistake of counsel or ignorance of the
> rules usually does not suffice, and some showing of "good faith on the part of the
> party seeking the enlargement and some reasonable basis for noncompliance within
> the time specified" is normally required.

86 F.3d at 175 (emphasis omitted)(internal quotation marks omitted)(quoting Putnam v. Morris,

833 F.2d 903, 905 (10th Cir. 1987)).  The Tenth Circuit explained that Putnam v. Morris "thus

recognized that the two standards, although interrelated, are not identical and that 'good cause'

requires a greater showing than 'excusable neglect.'"  In re Kirkland, 86 F.3d at 175.

Other courts within the Tenth Circuit have held that "the 'good cause' standard primarily

considers the diligence of the party . . . seeking an extension[, who] must show that despite due

diligence it could not have reasonably met the scheduled deadlines.  Carelessness is not compatible

---

[12]The version of rule 4(j) that the Tenth Circuit discussed in In re Kirkland was the version
in effect after the 1983 amendments to rule 4(j).  That version of rule 4(j) provided:

> If a service of the summons and complaint is not made upon a defendant within 120
> days after the filing of the complaint and the party on whose behalf such service
> was required cannot show good cause why such service was not made within that
> period, the action shall be dismissed as to that defendant without prejudice upon
> the court's own initiative with notice to such party or upon motion.  This
> subdivision shall not apply to service in a foreign country pursuant to subdivision
> (i) of this rule.

Act of Feb. 26, 1983, Pub. L. No. 97-462, 96 Stat. 2527.

with a finding of diligence and offers no reason for a grant of relief." <u>Pulsecard, Inc. v. Discover Card Servs. Inc.</u>, 168 F.R.D. 295, 301 (D. Kan.1996)(Rushfelt, M.J.)(alterations in original)(internal quotation marks omitted). The Honorable Dale A. Kimball, now-Senior United States District Judge for the District of Utah, concluded that "good cause" existed to amend his scheduling order when he decided to permit the plaintiff's counsel to withdraw as counsel. <u>Kee v. Fifth Third Bank</u>, No. CIV 06-0602 DAK/PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008). Judge Kimball reasoned: "[I]n light of the court's decision to permit [counsel] to withdraw . . . the court has determined that good cause exists for amending the existing scheduling order." <u>Kee v. Fifth Third Bank</u>, 2008 WL 183384, at *1.

## <u>LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994). A complaint's sufficiency is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. <u>See Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual

allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim for relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,

> much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint. See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.); Rohner v. Union Pac. R.R., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945). The plaintiff may counter this motion with an assertion that a different statute of

limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604, 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense). It appears, from caselaw in several Courts of Appeals, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140-W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1235-36 (D.N.M. 2014)(Browning, J.).

## NEW MEXICO NEGLIGENCE LAW UNDER THE NMTCA

The NMTCA is based on traditional tort concepts of duty and a reasonably prudent person's standard of care while performing that duty. See N.M. Stat. Ann. § 41-4-2(B). See also Eckhardt v. Charter Hosp. of Albuquerque, Inc., 1998-NMCA-017, ¶ 36, 953 P.2d 722, 732 ("Plaintiff's negligence claims must be premised on a duty that Charter owed to Plaintiff, and it is for the court to determine as a matter of law whether such a duty exists." (citation omitted));[13]

---

[13]The Court predicts that the Supreme Court of New Mexico would agree with Eckhardt v.

Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys., 1992-NMCA-125, ¶ 1, 845 P.2d 844 ("Duty

or responsibility is not provided in the Tort Claim Act; it must be found outside the Act either at

common law or by statute.").[14]  "Where there is no duty, there can be no negligence." Sw. Pub.

Serv. Co. v. Artesia Alfalfa Growers' Ass'n, 1960-NMSC-052, ¶ 21, 353 P.2d 62, 68 (1960).  See

Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86 ("Generally, a negligence

claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is

---

Charter Hospital of Albuquerque, Inc. that the court determines whether a duty exists as a matter
of law in negligence actions, based on the Court's read of the Supreme Court of New Mexico's
opinion in Calkins v. Cox Estates, 1990-NMSC-044, 792 P.2d 36, stating that the "court must
determine as a matter of law whether a particular defendant owes a duty to a particular plaintiff."
Calkins v. Cox Estates, 1990-NMSC-044, ¶ 8, 792 P.2d at 39 (emphasis omitted)(citing Schear v.
Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729("Whether a duty
exists is a question of law for the courts to decide.")).

    [14]The Court predicts that the Supreme Court of New Mexico would agree with Johnson v.
School Board of Albuquerque Public School System that the NMTCA does not provide a duty, so
the applicable duty derives either from common law or from statute.  The NMTCA's statutory text
clearly states that "[l]iability for acts or omissions under the Tort Claims Act shall be based upon
the traditional tort concepts of duty and the reasonably prudent person's standard of care in the
performance of that duty."  N.M. Stat. Ann. § 41-4-2(B).  In Rutherford v. Chaves County, the
Supreme Court of New Mexico affirmed the Court of Appeals of New Mexico's application of the
common-law duty standard to a defendant's conduct evaluated under the NMTCA.  See Rutherford
v. Chaves Cty., 2003-NMSC-010, ¶¶ 23-24, 69 P.3d 1199, 1205.  The Supreme Court of New
Mexico stated: "If Chaves County is found to have breached its common-law duty of ordinary
care . . . Chaves County may be held liable because such negligence falls within the waiver of
sovereign immunity."  Rutherford v. Chaves Cty., 2003-NMSC-010, ¶ 24, 69 P.3d at 1205.  In
California First Bank v. State, 1990-NMSC-106, 801 P.2d 646, the Supreme Court of New Mexico
found that violation of a statutory duty may establish negligence under the NMTCA.  See
California First Bank v. State, 1990-NMSC-106, ¶¶ 25-26, 801 P.2d at 653.  In Weinstein v. City
of Santa Fe ex rel. Santa Fe Police Department, furthermore, the Supreme Court of New Mexico
stated that the NMTCA waives immunity for the commission of enumerated common-law torts,
the deprivation of a statutory right, and the deprivation of a constitutional right, and that common
law or statutory duties may apply.  See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't,
1996-NMSC-021, ¶ 20, 916 P.2d at 1319.

typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages."); Bierner v. City of Truth or Consequences, 2004-NMCA-093, ¶ 18, 96 P.3d 322, 326 ("Consequently, the waiver of immunity in Section 41-4-4(A) of the TCA does not apply to the City because it had no duty upon which negligence could be premised.").[15]

Under New Mexico law, "negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d at 186 (internal quotation marks omitted)(quoting Ramirez v. Armstrong, 1983-NMSC-104, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, 797 P.2d 246, 249). New Mexico follows the principle "that a negligent actor only owes a duty to those whose injuries are a foreseeable result of the negligence." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 20, 73 P.3d at 190.

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime unless the actor at the time of his [or her] negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself [or herself] of the opportunity to commit such a tort or a crime.

Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 21, 73 P.3d at 191 (emphasis added)(internal

---

[15]The Court predicts that the Supreme Court of New Mexico would agree with this assertion from Bierner v. City of Truth or Consequences, because of the Supreme Court of New Mexico's consistent reaffirmance of the principle that to establish negligence liability, the defendant must have owed a duty to the plaintiff. See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 18, 916 P.2d at 1319; Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d at 729 ("A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant.").

quotation marks omitted)(quoting Sarracino v. Martinez, 1994-NMCA-013, ¶ 12, 870 P.2d 155, 157). "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader zone of risk that poses a general threat of harm to others." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 8, 73 P.3d at 186 (internal quotation marks omitted)(quoting McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla. 1992)(citation and footnote omitted)). The proximate-causation element of negligence "is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 8, 73 P.3d at 186 (quoting McCain v. Fla. Power Corp., 593 So.2d at 502). The Supreme Court of New Mexico opined on the duty element and the proximate-causation element of negligence, stating: "[T]he former is a minimal threshold legal requirement for opening the courthouse doors, whereas the latter is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 8, 73 P.3d at 186 (emphasis in original).

In Herrera v. Quality Pontiac, the plaintiffs sued the owner of a stolen vehicle for injuries caused by a collision with the owner's car when the owner left his keys in the car and the car unlocked at a garage. See 2003-NMSC-018, ¶ 2, 73 P.3d at 185. The plaintiffs provided an affidavit asserting that Albuquerque has a high rate of automobile thefts, that thieves are much more likely to steal unattended vehicles which have keys in the ignition, and that stolen cars are much more likely to be involved in automobile accidents. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 3, 73 P.3d at 191. The Supreme Court of New Mexico held that the affidavit established that the "Defendant's acts foreseeably created a zone of danger, which included

- 56 -

Plaintiffs."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 24, 73 P.3d at 192.  The Supreme

Court of New Mexico found that the plaintiffs' injuries -- which a third-party car thief's dangerous

driving caused -- were foreseeable and that the defendants owed a duty to the plaintiffs as a matter

of law.  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 25, 73 P.3d at 192.

In Bober v. New Mexico State Fair, a motorist was injured in a collision with a vehicle as

it exited the state fairgrounds parking area onto abutting highway.  See 1991-NMSC-031, ¶ 1,

808 P.2d 614, 616.  The motorist sued the state fair, state fair commission, and state police, and

appealed the district court's grant of summary judgment in favor of the defendants.  See Bober v.

N.M. State Fair, 1991-NMSC-031, ¶ 1, 808 P.2d at 616.  The Supreme Court of New Mexico

analyzed the duty owed to Bober and the foreseeability of the harm to determine whether immunity

was waived under § 41-4-6.  See Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 10, 808 P.2d at 618.

> Under the definitions of "negligence" and "ordinary care" in UJI Civil 1601 and
> 1603, the responsibility for determining whether the defendant has breached a duty
> owed to the plaintiff entails a determination of what a reasonably prudent person
> would foresee, what an unreasonable risk of injury would be, and what would
> constitute an exercise of ordinary care in light of all the surrounding
> circumstances . . . .  Every person has a duty to exercise ordinary care for the safety
> of others.  Whether or not defendant breached [that] dut[y] is a question of the
> reasonableness of its conduct, and thus a fact question.

Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 17, 808 P.2d at 621 (emphasis added)(citations and

internal quotation marks omitted)(quoting Knapp v. Fraternal Order of Eagles, 1987-NMCA-064,

¶ 10, 738 P.2d 129, 131 (citation omitted)).  "What constitutes 'ordinary care' varies with the

nature of what is being done. . . .  As the risk of danger that should reasonably be foreseen increases,

the amount of care required also increases."  Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 10,

808 P.2d at 618 (citations and internal quotation marks omitted)(quoting N.M.R.A. Civ. UJI 13-

1603).  The Supreme Court of New Mexico held that the state fair could not escape liability under the NMTCA, because it did not "adduce some evidence that it was unaware of the danger of an accident arising from a large number of cars exiting the Fairground at one time following an event like the concert at Tingley Coliseum."  Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 23, 808 P.2d at 622.

In Castillo v. County of Santa Fe, 1988-NMSC-037, ¶ 1, 755 P.2d 48, 49, the Supreme Court of New Mexico addressed whether to dismiss a complaint, because § 41-4-6 waived the defendants' immunity.  In that case, the mother of an injured invitee sued the operator of county-owned public housing to recover damages for dog bite injuries.  See Castillo v. Cty. of Santa Fe, 1988-NMSC-037, ¶ 2, 755 P.2d at 49.  The Supreme Court of New Mexico noted that it, "assume[d] the truth of the facts alleged in the complaint" and held that Castillo pled that the housing authority "was aware or should have been aware of the continuing problem of loose-running dogs and the resulting danger this condition posed for the common area of Valle Vista which the Housing Authority had the duty to maintain in a safe condition."  Castillo v. Cty. of Santa Fe, 1988-NMSC-037, ¶ 4, 755 P.2d at 50 (emphasis added).  In finding that there was an unsafe condition, the Supreme Court of New Mexico held that the "existence of a duty [rested] upon whether dogs roaming loose upon the common grounds of a government-operated residential complex could represent an unsafe condition," and found that, given the potential safety hazard for residents and their invitees, "loose-running dogs could represent an unsafe condition upon the land."  Castillo v. Cty. of Santa Fe, 1988-NMSC-037, ¶ 9, 755 P.2d at 51. Ultimately, it held that "[t]he complaint sufficiently alleges facts that state a claim upon which relief could be granted."

Castillo v. Cty. of Santa Fe, 1988-NMSC-037, ¶ 10, 755 P.2d at 51.

Roaming prison gangs also present a danger to all inmates where the gang is known to be violent and has access to weapons. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶ 19, 875 P.2d 393, 399, cert. denied, Nos. 22,079, 22,081, 879 P.2d 91 (1994)(unpublished table opinion).[16] The Court of Appeals of New Mexico followed the reasoning of Castillo v. County of Santa Fe, stating:

> In Castillo, our Supreme Court determined that the plaintiff had adequately stated a claim under Section 41-4-6 by alleging in the complaint that loose-running dogs on the common grounds of the county-owned and county-operated public housing project represented an unsafe condition, provided the county knew or should have known of the danger and that the danger was foreseeable.

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶ 15, 875 P.2d at 398 (emphasis added). The Court of Appeals of New Mexico held that the plaintiff had

> [s]tated a claim sufficient to waive immunity under Section 41-4-6 because Defendants knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable.

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (emphasis added).

## LAW REGARDING THE NMTCA

---

[16]The Court predicts that the Supreme Court of New Mexico agrees with the reasoning in Callaway v. New Mexico Department of Corrections. In Callaway v. New Mexico Department of Corrections, the Court of Appeals for New Mexico interpreted the Supreme Court of New Mexico's decision in Castillo v. County of Santa Fe broadly, to permit liability under § 41-4-6 even where the injury resulted in no physical defect to the premises. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶ 17, 875 P.2d at 398. In Bober v. New Mexico State Fair, the Supreme Court of New Mexico cited to Castillo v. County of Santa Fe and stated that "[t]he broader view, which we continue to think is the correct view, was articulated by this Court in Castillo v. County of Santa Fe." Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 27, 808 P.2d at 623.

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2(A). The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C). The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d at 256 ("Consent to be sued may not be implied, but must come within one of the exceptions

to immunity under the Tort Claims Act."),[17] rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1251 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished). Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.");[18] Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 8, 952 P.2d 474, 477 (noting that a

---

[17]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit. Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act." N.M. Stat. Ann. § 41-4-2. The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives. See N.M. Stat. Ann. § 41-4-4. The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply. See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021, ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 6, 916 P.2d at 1313.

[18]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies. In Begay v. State, the Supreme Court of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied. See Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no

- 61 -

plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity);[19] Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶ 11, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board);[20] Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects the "free exercise of religion"). The NMTCA does not limit the availability of many forms of equitable relief. See N.M. Stat. Ann. § 41-4-17(A) ("Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."); El Dorado Utils. Inc. v. Eldorado Area Water & Sanitation Dist., 2005-NMCA-036, ¶ 28, 109 P.3d 305, 312 ("The Tort Claims Act would not bar a claim for injunctive relief.").[21]

_____

express waiver for the medical examiner under the Tort Claims Act."). The Court notes that in Begay v. State, as discussed supra n.16, clarifies that "[c]onsent to be sued may not be implied" under the NMTCA. Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d 252, 256.

[19]For the reasons discussed supra n.16, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

[20]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in §§ 41-4-5 to -12. See N.M. Stat. Ann. §§ 41-4-5 to -12. As discussed supra n.16, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

[21]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with El Dorado Utilities, Inc. v. Eldorado Area Water & Sanitation District, that nothing in the NMTCA bars a separate claim for injunctive relief. While the Supreme Court of

Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117, ¶ 8, 723 P.2d at 255.

## LAW REGARDING NMTCA § 41-4-6

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  N.M. Stat. Ann. § 41-4-6.  Section 41-4-6's exemption balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049, ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotation marks omitted).  To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waive[s] that immunity in certain defined circumstances." Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049, ¶ 6, 970 P.2d at 1145.  Section 41-4-6

> allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings."  [NMTCA § 41-4-6].  For the waiver to apply, the negligent "operation or maintenance" must create a dangerous condition that threatens the

---

New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046, ¶ 14, 899 P.2d 1132, 1135, the Act only limits damages brought against the state or state employees acting within the scope of their duty and does not limit plaintiffs from seeking other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046, ¶ 14, 899 P.2d at 1135.

general public or a class of users of the building.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 8, 141 P.3d at 1261.

The Supreme Court of New Mexico has adopted a broad interpretation of what constitutes a "building, public park, machinery, equipment, or furnishings." N.M. Stat. Ann. § 41-4-6. Like common-law premises liability, the § 41-4-6 waiver may apply even when the negligence at issue occurred outside the boundaries of property owned and operated by the government. "[T]he duty of a landowner to exercise ordinary care to avoid creating, or permitting an unreasonable risk of harm to others is not determined by . . . the happenstance that the accident and resulting injury occur inside or outside the property boundary." Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 12, 808 P.2d at 618-19. The Supreme Court of New Mexico explained, furthermore, that "[w]hile [§] 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049, ¶ 9, 970 P.2d at 1146 (quoting N.M. Stat. Ann. § 41-4-6). Also, like common-law premises liability, § 41-4-6 does not require that the negligence be related to a physical aspect of the building, machinery, or equipment. "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building.") Encinas v. Whitener Law Firm, P.A., 2013-NMCA-045, ¶ 10, 299 P.3d 424, 428 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1261). Section 41-4-6 instead "contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Bober v. N.M. State Fair, 1991-NMSC-031,

¶ 27, 808 P.2d at 623 (citations and internal quotation marks omitted).

The Supreme Court of New Mexico has also interpreted § 41-4-6's phrase "operation and maintenance" somewhat broadly. See N.M. Stat. Ann. § 41-4-6. "[Operation and maintenance] is not 'limited [in] its applicability strictly to defects in the physical building.'" Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1139 (10th Cir. 2006)(quoting Upton v. Clovis Mun. Sch. Dist., 2005-NMCA-085, ¶ 6, 141 P.3d at 1260-61). New Mexico courts have, however, found that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v. Cordova, 1987-NMCA-020, ¶ 5, 734 P.2d at 256,[22] negligent design, see Rivera v. King, 1988-NMCA-093, ¶¶ 29-34, 765 P.2d 1187, 1194, cert. denied, No. 18,041, 765 P.2d 758 (1988)(unpublished table opinion),[23] negligent inspection, see Martinez v. Kaune, 1987-NMCA-

---

[22]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with Pemberton v. Cordova, that negligent supervision generally does not waive immunity. The Supreme Court of New Mexico clarified in Encinias v. Wheeler Law Firm, P.A., 2013-NMSC-045, ¶ 14, 310 P.3d 611, 617, that while there is no waiver of immunity for negligent supervision, "prisons cannot turn a blind eye to threats to their inmates' safety." 2013-NMSC-045, ¶ 14, 310 P.3d at 617. Although the Supreme Court of New Mexico clarified in Encinias v. Wheeler Law Firm, P.A. that the Court of Appeals of New Mexico's narrow read of § 41-4-6(A) has since been discredited, it acknowledged that "its central premise, when analyzed under a premises liability theory, is still valid." Encinias v. Wheeler Law Firm, P.A., 2013-NMSC-045 ¶ 13, 310 P.3d at 617. Negligent supervision alone is not enough to waive immunity under § 41-4-6(A), but allegations that a governmental entity was negligent "in failing to exercise reasonable care to discover and prevent dangerous conditions caused by people on its premises," even where that care is supervisory in nature, might waive immunity under § 41-4-6(A). See Encinias v. Wheeler Law Firm, P.A., 2013-NMSC-045, ¶ 13, 310 P.3d at 617. In Espinoza v. Town of Taos, 1995-NMSC-070, 905 P.2d 718, the Supreme Court of New Mexico stated: "However, Section 41-4-6 does not grant a waiver for claims of negligent supervision. . . ." Espinoza v. Town of Taos, 1995-NMSC-070, ¶ 8, 905 P.2d at 721 (citing Pemberton v. Cordova, 1987-NMCA-020, ¶ 5, 734 P.2d at 256).

[23]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with Rivera v. King that negligent design does not fit within § 41-4-6's grounds for an immunity waiver, based on Espinoza v. Town of Taos, 1995-NMSC-070, ¶ 8, 905 P.2d at 721

131, ¶¶ 5-10, 745 P.2d 714, 716-17, <u>cert. denied</u>, No. 17,361, 744 P.2d 912 (1987)(unpublished table opinion),[24] negligent regulation and investigation of violations, <u>see</u> <u>Caillouette v. Hercules, Inc.</u>, 1992-NMCA-008, ¶ 31, 827 P.2d 1306, 1312;[25] or negligent classification of a prison inmate, <u>see</u> <u>Archibeque v. Moya</u>, 1993-NMSC-079, ¶¶ 9-12, 866 P.2d at 348.

Although negligent supervision alone is not enough to trigger the § 41-4-6 waiver, "a claim that involves elements of negligent supervision can still fall under the waiver if that supervision is

---

(stating that § 41-4-6 does not grant a waiver for claims of negligent design)(citing <u>Rivera v. King</u>, 1988-NMCA-093, ¶¶ 29-34, 765 P.2d at 1194).

[24]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with <u>Martinez v. Kaune</u> that negligent inspection does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070, ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent inspection)(citing <u>Martinez v. Kaune</u>, 1987-NMCA-131, ¶¶ 5-10, 745 P.2d at 716-17).

[25]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the Court of Appeals of New Mexico in <u>Caillouette v. Hercules, Inc.</u> that negligent regulation and investigation of violations alone does not fall within the scope of the § 41-4-6 waiver, based on the Supreme Court of New Mexico's decision in <u>Romero v. State</u>, 1991-NMSC-071, 851 P.2d 628, and its denial of certiorari after <u>Caillouette v. Hercules</u>. In <u>Romero v. State</u>, the Supreme Court of New Mexico concluded that the New Mexico State Highway Department's statutory responsibilities constituted supervision of "maintenance" and fell within the § 41-4-6 waiver's scope. 1991-NMSC-071, ¶ 6, 815 P.2d at 630. The Supreme Court of New Mexico stated that "the greater supervisory responsibilities contemplated by the 1986 law included more than issuing regulations. Those responsibilities could have included supervising the county's actual day-to-day maintenance of the roadway." <u>Romero v. State</u>, 1991-NMSC-071, ¶ 9, 815 P.2d at 630. In <u>Romero v. State</u>, the Supreme Court of New Mexico suggested that, if the Highway Department's only responsibility had been to issue regulations, its actions would not have constituted maintenance. <u>See</u> 1991-NMSC-071, ¶ 9, 815 P.2d at 630. Although the Court is reluctant to read too much into the denial of a petition for certiorari, the Supreme Court of New Mexico did deny certiorari in <u>Caillouette v. Hercules</u>, evincing a disinclination to reconsider the Court of Appeals of New Mexico's decision in <u>Caillouette v. Hercules</u>. <u>See</u> <u>Caillouette v. Archibeque</u>, No. 20,355, 826 P.2d 573 (1992)(unpublished table decision).

directly tied to the operation . . . of the building." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 16, 141 P.3d at 1263. See Leitheid v. City of Santa Fe, 1997-NMCA-041, ¶¶ 3-4, 940 P.2d 459, 467;[26] Romero v. State, 1991-NMSC-071, ¶ 9, 815 P.2d 628, 630 (the Highway Department's maintenance responsibilities included "supervising the county's actual day-to-day maintenance of the roadway."), receded from on other grounds by Dunleavy v. Miller, 1993-NMSC-059, 862 P.2d 1212. In Leitheid v. City of Santa Fe, city pool lifeguards failed to ask for children's ages and heights, although pool regulations required adult supervision for children younger than seven and shorter than forty-eight inches. See Leitheid v. City of Santa Fe, 1997-NMCA-041, ¶ 2, 940 P.2d at 460-61. The Court of Appeals of New Mexico found that when the "lifeguards did not adequately perform duties that were essential to public safety, they negligently operated the swimming pool and thereby created a condition on the premises that was dangerous to [the child] and the general public." Leitheid v. City of Santa Fe, 1997-NMCA-041, ¶ 12, 940 P.2d at 462. The school's conduct in Upton v. Clovis Municipal School District went

---

[26]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the reasoning of the Court of Appeals of New Mexico in Leitheid v. City of Santa Fe, in which the Court of Appeals of New Mexico concluded that the City's failure to provide adequate lifeguard supervision constituted negligent operation of a swimming pool, because the City's negligence created a "dangerous condition on the physical premises which affects the swimming public at large." Leitheid v. City of Santa Fe, 1997-NMCA-041, ¶ 15, 940 P.2d at 463. In Seal v. Carlsbad Independent School District, 1993-NMSC-049, ¶¶ 10-11, 860 P.2d 743, 746, the Supreme Court of New Mexico suggested that, by not providing lifeguards, a school district may have waived immunity because its negligence caused an unsafe, dangerous, or defective condition on property owned and operated by the government. See 1993-NMSC-049, ¶¶ 10-11, 860 P.2d at 746. In Espinoza v. Town of Taos, the Supreme Court of New Mexico cited to Seal v. Carlsbad Independent School District as an example of a case under § 41-4-6 concerning negligent conduct that itself created an unsafe condition for the public, permitting a waiver of immunity. See Espinoza v. Town of Taos, 1995-NMSC-070, ¶ 14, 905 P.2d at 722.

beyond negligent supervision, because: "(i) the school ignored information that the plaintiffs provided them; (ii) the school failed to warn the substitute teacher about the student's condition; and (iii) the school failed to follow through with the proper emergency procedures." C.H. v. Los Lunas Schools Bd. of Educ., 852 F. Supp. 2d at 1353 (citing Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 18, 141 P.3d at 126). In Rave v. Board of Commissioners for the County of Bernalillo, No. CIV 17-0636 RB/LF, 2017 WL 3600452, at *10 (D.N.M. Aug. 18, 2017)(Brack, J.), Judge Brack found that § 41-4-6's waiver applied where "the County's employees ignored information [plaintiff] gave them about his medical condition, failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues." Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10.

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not include the security, custody, and classification of inmates. . . . Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 1993-NMSC-079, ¶ 8, 866 P.2d at 347 (citations omitted). In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque

informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque was released into general population, and Gallegos assaulted him that night. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico Department of Corrections in federal court for violations under 42 U.S.C. § 1983 and the NMTCA. See 1993-NMSC-079, ¶ 3, 866 P.2d at 346. The district court interpreted § 41-4-6 narrowly and held that the statute did not waive immunity for negligent security and custody of inmates at the penitentiary. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. Thereafter, Archibeque's § 1983 claims were resolved in favor of Moya-Martinez and the other corrections employees. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. The federal district court denied Archibeque's motion for reconsideration. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. Archibeque appealed, and the Tenth Circuit certified a question to the Supreme Court of New Mexico:

> Does [Section 41-4-6] of the New Mexico Tort Claims Act, [NMTCA Sections 41-4-1 to -29], provide immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?

See 1993-NMSC-079, ¶ 1, 866 P.2d at 345-46. Archibeque argued that Moya-Martinez was participating in the operation of the penitentiary when she classified Archibeque as an inmate who could safely be released into the general prison population, and he argued that Moya-Martinez's alleged negligence in misclassifying him and releasing him into the general population constituted negligent operation of the penitentiary, thereby waiving immunity under § 41-4-6.

See 1993-NMSC-079, ¶ 5, 866 P.2d at 346-47.  The Supreme Court of New Mexico found that § 41-4-6 did not waive Moya-Martinez' immunity, stating: "The 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates."  See 1993-NMSC-079, ¶ 8, 866 P.2d at 347 (quoting N.M. Stat. Ann. § 41-4-6).  The Supreme Court of New Mexico reasoned that Moya-Martinez was not operating and maintaining the prison's physical premises when she negligently classified Archibeque.

> Rather, she was performing an administrative function associated with the operation of the corrections system.  Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions.  To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute.  See State v. Riddall, 112 N.M. 78, 80, 811 P.2d 576, 578 (Ct. App.)(stating that when interpreting a statute, an appellate court is required to consider the plain meaning of the words used and the intended purpose of the statute), cert. denied, 112 N.M. 21, 810 P.2d 1241 (1991).

1993-NMSC-079, ¶ 8, 866 P.2d at 347.  The Supreme Court of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population.  Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly.  See Section 41-4-2(A).

1993-NMSC-079, ¶ 11, 866 P.2d at 348.  According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that

results in injury to an inmate." 1993-NMSC-079, ¶ 14, 866 P.2d at 349. The Honorable Richard E. Ransom, then-Chief Justice of the Supreme Court of New Mexico, stated that, whereas a "discrete administrative decision" does not waive immunity, a "general condition of unreasonable risk from negligent security practices" could waive immunity. Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266 (quoting Archibeque v. Moya, 1993-NMSC-079, ¶ 16, 866 P.2d at 349 (Ransom, C.J., concurring)).

The Court has concluded that Chief Justice Ransom determined that § 41-4-6 applies when alleged negligence changes the condition of the premises in question, and when the plaintiff's injuries arise from the premises' condition. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. In the context of inmate misclassification claims, the Court has concluded that a conclusory allegation that one inmate's misclassification created a danger for the inmate population could not support finding a waiver under § 41-4-6, and found that, to come within Chief Justice Ransom's footnote, inmate misclassification -- allegedly performed negligently -- must raise security risks, not health risks. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. "The Court is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security." Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266-67.

New Mexico caselaw after Archibeque v. Moya suggests that, for negligent supervision, operation, or security practices to constitute negligent operation and maintenance, the negligent condition created must threaten the safety of the public or of a class of users -- not merely one individual. In Archibeque v. Moya, the Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a

situation in which a single inmate is put at risk is not comparable." 1993-NMSC-079, ¶ 14 n.3, 866 P.2d at 349 n.3. Chief Justice Ransom's concurring opinion noted:

> I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life. The classification of Archibeque did not change the condition of the premises. I see Archibeque's injuries as having been proximately caused by a discrete administrative decision. As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody. The risk arose not from a condition of the premises (as with the wild dogs in Castillo or, arguably, the inadequate health care facilities in Silva [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

1993-NMSC-079, ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring). After Archibeque v. Moya, the Supreme Court of New Mexico clarified that, for § 41-4-6's waiver to apply, the question is not whether the alleged negligence created an actual risk of harm for only a single individual, but rather whether the alleged negligence created a condition that poses a potential risk to the general public or to a class of people using the premises in question. See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 8, 141 P.3d at 1261.

In Leitheid v. City of Santa Fe, the Court of Appeals of New Mexico determined that the plaintiffs' claim was not merely negligent supervision, but rather negligent operation, creating a dangerous condition with a potential risk for more than just a single individual. See Leitheid v. City of Santa Fe, 1997-NMCA-041, ¶ 5, 940 P.2d at 467. In Upton v. Clovis Municipal School District, the Supreme Court of New Mexico held that, "[i]f the only alleged misconduct toward Sarah had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton's claim . . . would be practically identical to the single claim of negligent supervision we found inadequate in Espinoza." Upton v. Clovis Mun. Sch. Dist.,

2006-NMSC-040, ¶ 21, 141 P.3d at 1264.  In Espinoza v. Town of Taos, the Supreme Court of New Mexico concluded that, for § 41-4-6's waiver to apply, "the critical question is whether the condition creates a potential risk to the general public."  1995-NMSC-070, ¶ 9, 905 P.2d at 683.  Section 41-4-6's waiver may also apply if the negligent operation or maintenance creates a dangerous condition that threaten "a class of users of the building."  Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 8, 141 P.3d at 1261.  See Rave v. Bd. of Comm'rs for Cty. of Bernalillo, 2017 WL 3600452, at *10 (defining the class of building users as "incarcerated inmates with medical issues."); Castillo v. Cty. of Santa Fe, 1988-NMSC-037, ¶ 9, 755 P.2d at 51 (holding that, "[g]iven the potential for the safety of Valle Vista residents and invitees to be compromised by this situation, we find that, under the right circumstances, loose-running dogs could represent an unsafe condition upon the land").

New Mexico courts have also required that, for § 41-4-6's waiver to apply, the public employees knew or should have known of the danger posed by the condition.  In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049, ¶ 19, 875 P.2d at 399,[27] the Court of

---

[27]The Court predicts that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico in Callaway v. New Mexico Department of Corrections that § 41-4-6's waiver applies where a prison knew certain inmates were dangerous and failed to supervise them, based on the Supreme Court of New Mexico's favorable citations to Callaway v. New Mexico Department of Corrections.  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 10, 310 P.3d at 616 ("A prison creates a dangerous condition by allowing known gang members to congregate in a recreation room that is shielded from observation by guards.  Callaway, 1994-NMCA-049, ¶¶ 4, 19, 117 N.M. 637, 875 P.2d 393."); Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 23, 141 P.3d at 1264 (citing Callaway v. New Mexico Department of Corrections for the assertion that, for § 41-4-6's purposes, a condition must be at least potentially dangerous to the particular class of people using a building or facility in question, rather than actually dangerous to the entire public); Espinoza v. Town of Taos, 1995-NMSC-070, ¶ 13, 905 P.2d at 722 (discussing Callaway v. New Mexico Department of Corrections and quoting the Court of

Appeals of New Mexico held that the New Mexico Department of Corrections "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 1994-NMCA-049, ¶ 19, 875 P.2d at 399. The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251-56; C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d at 1358-59 (holding that allegations of negligence against the defendants fell within the § 41-4-6 waiver, in part, because the plaintiff "adequately allege[d] that the defendants knew or should have known of the dangerous condition").

The Court has also addressed waiver of NMTCA immunity under § 41-4-6 in several other opinions. In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145 (D.N.M. 2011)(Browning, J.), the Court held that immunity was not waived under § 41-4-6 for the plaintiffs' ingress and egress from a waste transfer facility, because, although New Mexico is liberal in protecting people traveling on public land, such a duty would be without limits. See 805 F. Supp. 2d at 1177. The Court found that the plaintiffs' injuries, in that case, did not arise from an unsafe, dangerous, or defective condition of the defendant's property. See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d at 1182. In Trujillo v. Salazar, No. CIV 04-0689 JB/WDS, 2006 WL 1228827 (D.N.M. March 1, 2006)(Browning, J.), the Court found

Appeals of New Mexico's findings).

that immunity was not waived under § 41-4-6, because "the gravamen of the negligent operation claim against Salazar was not that Salazar himself ha[d] committed negligence by showing up to work every day, but that [the Central New Mexico Correctional Facility ('CNMCF')] negligently operated the facility by allowing Salazar to continue working at the facility." 2006 WL 1228827, at *9 (emphasis omitted). The Court further held that, "[t]o the extent that Trujillo may be arguing that Salazar negligently operated CNMCF by carrying on his employment at CNMCF after the first two alleged incidents, his decision to persist in his job was not a condition on the premises." Trujillo v. Salazar, 2006 WL 1228827, at *9. In Williams v. Board of Regents of University of New Mexico, 20 F. Supp. 3d 1177, 1195 (D.N.M. 2014)(Browning, J.), the Court concluded that a claim brought under § 41-4-6 on the basis of negligent misclassification of an inmate would likely fail if the alleged negligence only exposed a plaintiff to health risks, rather than security risks. The Court cited to Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266, in which the Court stated that, to fall within Chief Justice Ransom's concurrence in Archibeque v. Moya, a misclassification "must raise security risks, not health risks." Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266.

## LAW REGARDING NMTCA § 41-4-9

Section 41-4-9 of the NMTCA provides:

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

N.M. Stat. Ann. § 41-4-9. "Section 41-4-9 applies to the operation of facilities which provide medical care directly to people." Redding v. City of Truth or Consequences, 1984-NMCA-132,

¶ 8, 693 P.2d 594, 596.[28]  The Court of Appeals of New Mexico found it significant that the New Mexico Legislature did not use the word "maintenance" in § 41-4-9 and concluded "that the legislature chose to provide a more limited waiver for the activities of public employees in connection with a mental institution or clinic than it provided for other activities of public

---

[28]The Court believes that the Supreme Court of New Mexico is likely to agree with Redding v. City of Truth or Consequences, if presented with the issue.  Section 41-4-9's text lists the applicable facilities as "any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities."  N.M. Stat. Ann. § 41-4-9.  The Supreme Court of New Mexico declines to

> add words except where necessary to make the statute conform to the obvious intent of the legislature, or to prevent its being absurd.  Morruzi v. Federal Life & Cas. Co., 42 N.M. 35, 75 P.2d 320, 115 A.L.R. 407.  But where the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity, or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others.  State v. Southern Pacific Co., 34 N.M. 306, 281 P.29; Janney v. Fullroe, 47 N.M. 423, 144 P.2d 145.

State v. Nance, 1966-NMSC-207, ¶ 16, 419 P.2d 242, 247, abrogated on other grounds by State v. Wilson, 2011-NMSC-001, 248 P.3d 315.  In Begay v. State, the Court of Appeals of New Mexico cited to Redding v. City of Truth or Consequences to support its conclusion that Office of the Medical Investigator is not a like facility as contemplated by § 41-4-9.  See Begay v. State, 1985-NMCA-117, ¶ 11, 723 P.2d at 256.  The Tenth Circuit noted that the Court of Appeals of New Mexico "refused in Begay to read 'the operation of the state medical investigator's office' into this exception.  Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d 1114, 1117 (quoting Begay v. State, 1985-NMCA-117, ¶ 11, 723 P.2d at 256).  Although this case was reversed by the New Mexico Supreme Court, the reversal was based on other grounds, and we believe that this decision provides sufficient evidence of how New Mexico's courts would rule on this issue."  Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117.  The Court agrees with the Tenth Circuit that the Supreme Court of New Mexico's reversal of Begay v. State on other grounds provides evidence of how it would rule on the issue of what facilities are "like facilities" pursuant to § 41-4-9, and considering Begay v. State adopted the reasoning of Redding v. City of Truth or Consequences, the Court predicts that the Supreme Court of New Mexico would agree with Redding v. City of Truth or Consequences on this issue.

employees." Armijo v. Dep't of Health & Env't, 1989-NMCA-043, ¶ 11, 775 P.2d 1333, 1335.[29]

The Court of Appeals of New Mexico stated that, for § 41-4-9's waiver to apply, the public

employee in question must have been involved in clinical decision-making. See Armijo v. Dep't

of Health & Env't, 1989-NMCA-043, ¶ 12, 775 P.2d at 1335.

New Mexico courts have generally denied the application of § 41-4-9 and found immunity

for the state government entity and employees when medical contractors operate the medical unit

in question. See Lee v. McKinley Cty. Adult Det. Ctr., No. CIV 12-1124 MCA/LAM, 2014 WL

12788056, at *10 (D.N.M. Sept. 9, 2014)(Armijo, C.J.)(citing Lessen v. City of Albuquerque,

2008-NMCA-085, ¶ 31, 187 P.3d at 185 (holding that § 41-4-9 did not waive sovereign immunity

for the City of Albuquerque, because a medical contractor operates the medical unit at the

Bernalillo County Metropolitan Detention Center("MDC"))); Celaya v. Hall, 2004-NMSC-005,

85 P.3d 239 (recognizing that a governmental entity could not be held liable under the NMTCA

for the alleged acts of an independent contractor). See also Kellum v. Bernalillo Cty., No. 1:14-

cv-00163 RB/CG, 2015 WL 12859577, at *10 (D.N.M. June 9, 2015)(Brack, J.)(holding that § 41-

4-9 was inapplicable to Bernalillo County because an independent contractor operates the medical

unit at the MDC).

In Lee v. McKinley County Adult Detention Center, the Honorable M. Christina Armijo,

---

[29]While the Court is reluctant to read too much into a failure to comment, the Court predicts the Supreme Court of New Mexico would, if presented with the issue, find that the New Mexico Legislature intended to provide a more limited waiver in § 41-4-9 by omitting the word "maintenance," and the Court bases its prediction, at least in part, on the fact that in the twenty-nine years since the Court of Appeals of New Mexico decided Armijo v. Department of Health & Environment, numerous Courts of Appeals decisions have relied on it, and the Supreme Court of New Mexico has never issued an opinion challenging its reasoning or ruling.

then-Chief District Judge for the District of New Mexico, stated that, under New Mexico law, "a 'public employee' means an officer, employee or servant of a governmental entity, excluding independent contractors except for individuals defined in Paragraphs (7), (8), (10), (14) and (17) of this subsection." Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10 (quoting N.M. Stat. Ann. § 41-4-3(F)). Paragraph 7 of § 41-4-3(F) provides an exception to the definition of public employees for "licensed medical, psychological or dental arts practitioners providing services to the corrections department pursuant to contract." N.M. Stat. Ann. § 41-4-3(F)(7). In Lee v. McKinley County Adult Detention Center, then-Chief Judge Armijo concluded that the MDC "does not fall under the corrections department, and thus New Mexico has not waived immunity for the actions of [its medical contractor's] employees." Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10. See N.M. Stat. Ann. § 33-3-1(A) ("The common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof."); N.M. Stat. Ann. § 33-3-27(E) (requiring contractors "for the operation or provision and operation of jails" to assume all liability from the jails' provision and operation).

The Court of Appeals of New Mexico has also held, in the context of prison medical units, that "liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services." Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *49 (citing Lessen v. City of Albuquerque, 2008-NMCA-085, ¶¶ 28-30, 187 P.3d at 320). The Court of Appeals of New Mexico explained:

> We agree with the general proposition stated in *Estelle* [v. Gamble, 429 U.S. 97 (1976)] and *Ancata* [v. Prison Health Servs., Inc., 769 F.2d 700 (11th Cir. 1985)]

that governmental entities must provide appropriate medical care to persons they incarcerate. *See Estelle*, 429 U.S. at 103; *Ancata*, 769 F.2d at 705. Such governmental entities cannot escape that duty by contracting with third parties to provide the medical care, and a governmental entity "remains liable for any constitutional deprivations caused by the policies or customs of the [third party]." *Ancata*, 769 F.2d at 705. This is not to say, however, that a governmental entity's constitutional obligation equates with waiver of immunity for negligent operation of an infirmary under New Mexico's TCA. If Plaintiff had alleged and could prove that the City's inadequate medical care deprived Decedent of a constitutional right, Plaintiff might be entitled to recover under the waiver of immunity provided in Section 41-4-12. But, as discussed in the next section of this opinion, Plaintiff's allegations of conduct that is merely negligent are insufficient to establish such a constitutional violation. *See Ancata*, 769 F.2d at 703 (indicating that claim of constitutional deprivation in the context of inadequate medical care requires a showing of "deliberate indifference to serious medical needs").

Lessen v. City of Albuquerque, 2008 NMCA-085, ¶¶ 30-31, 187 P.3d at 320. See Morrissey v. Ulibarri, 08-cv-246 WJ/RHS, 2010 WL 11470879, *5 & n.3 (D.N.M. April 28, 2010)(Johnson, J.)(concluding that a plaintiff cannot sue a correctional facility's wardens under § 41-4-9 for preventing an inmate from receiving medication, properly maintaining his colostomy bag, attending critical chemotherapy appointments, and receiving follow-up surgery in a timely manner -- without presenting some evidence at the summary judgment stage that the wardens had supervisory power over the privately-run medical facility). No state or federal case in New Mexico has held that the § 41-4-9 immunity waiver applies when an independent contractor operates the medical facility in question. See, e.g., Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10-11; Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *49; Kellum v. Bernalillo Cty., 2015 WL 12859577, at *10.

That a contractor operates a medical facility is not necessarily dispositive of the immunity waiver issue as to all non-contractor entities and personnel who might be involved in the operation of that medical facility. See, e.g., Silva v. State, 1987-NMSC-107, ¶ 9, 745 P.2d at 385 (concluding

that § 41-4-9's waiver is arguably applicable to the Secretary of Corrections, if the factfinder determines he failed to exercise ordinary care in the discharge of duties found to include the operation or maintenance of healthcare facilities inside the prison). For a non-contractor person or entity to be liable, the claims against them must relate to the actual medical care -- and specifically, to the clinical decision-making or supervision of clinical decision-making -- at the medical unit in question. See Armijo v. Dep't of Health & Env't, 1989-NMCA-043, ¶ 13, 775 P.2d at 1335 (determining that § 41-4-9 could not apply for the plaintiff's negligence claims against the Health and Environment Department ("HED"), because the HED did not regulate the clinical decision-making at the mental health facility, and therefore did not operate the facility within § 41-4-9's meaning); Reese v. Bd. of Cty. Comm'rs of the Cty. of Bernalillo, CIV No. 10-1247 LH/RHS, 2012 WL 13076227, at *7 (D.N.M. Sept. 18, 2012)(Hansen, J.)("Plaintiff's allegations against Defendant Torres and Defendant County relate to their management of the grievance system rather than the actual medical treatment received by inmates at the infirmary. As such, § 41-4-9 does not operate to waive immunity . . . ."); Gallegos v. Trujillo, 1992-NMCA-090, ¶ 18, 839 P.2d 645, 649 ("In *Armijo* we held that an agency's regulation of a mental health facility was not "operation" of the mental health facility where the agency was not involved in the actual clinical decision-making . . . .").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal

and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens"). "The qualified immunity analysis is the same whether the claims are brought under *Bivens* or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights. To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); see also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

**1. Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such

an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[30] the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for

---

[30]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(internal quotation marks omitted)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[31] "Courts should think carefully before expending

---

[31]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of

the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a

compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[32] See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

## 2.  **Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly

---

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[32]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation. It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court. Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice. The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing. In practice, Saucier v. Katz worked better.

developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends

substantially upon the level of generality at which the relevant 'legal rule' is to be identified."
Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth

Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I") that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).  In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741 . . . . *Id.* at 741..  This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730 . . . (2002). As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. 548, 551

(2017)(per curiam). In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640). With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552. See District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018) ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances."). Although the Supreme Court noted that "we have held that [Tennessee v.] Garner[, 471 U.S. 1 (1985)] and Graham[ v. Connor] do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham." 137 S. Ct. at 552.[33]

---

[33]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established. As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). Although still stating that there might be an obvious case under Graham v. Connor that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, see

Malone v. Board of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 556 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and

**LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS**

scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court of the United States, has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) - seems to be in agreement with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Board of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty., 489 U.S. 189, 197(1989)). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty., 489 U.S. at 195. The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty., 489 U.S. at 195.

1.     **Exceptions to the General Rule.**

There are, however, two exceptions to the general rule. The first -- the special-relationship exception -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994). The second -- the danger-creation exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133,

1142 (10th Cir. 2006)).  The Court's decision in <u>Glover v. Gartman</u> was also consistent with a previous Tenth Circuit decision -- <u>Radecki v. Barela</u>, 146 F.3d 1227 (10th Cir. 1998) -- in which the Tenth Circuit stated:

> It is true, of course, that state actors are generally only liable under the Due Process Clause for their own acts and not private violence.  There are, however, two exceptions to that rule.  First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison.  Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that harm is ultimately inflicted by a private party.  The shocks the conscience standard applies to both types of suits.

<u>Radecki v. Barela</u>, 146 F.3d at 1230.

## 2.    **The Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  <u>See</u> <u>Liebson v. N.M. Corr. Dep't</u>, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual *(e.g., when the individual is a prisoner or involuntarily committed mental patient)*." <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir. 1995).

## 3.    **The Dange--Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." <u>Uhlrig v. Harder</u>, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or

increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923. See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk. See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M.2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992). The intent to place a person unreasonably

at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### 4. **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)).

Establishing these limits advances

three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574). "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922

F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M.2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x. 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiff's substantive due-process

rights when they did not take sufficient action to prevent a student at the school from "racking"[34]

the plaintiff's son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct

did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [J.H.' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked. . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory

---

[34] The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2.

decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[35] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-

---

[35]In Bivens, the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. 2011)(Browning, J.)(citing Monell, 436 U.S. at 689). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.     **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## 2. **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth

Circuit has explained that § 1983 liability should be "read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Martinez v. Carson, 697 F.3d at 1255 (internal quotation marks omitted)(quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[36]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400. In civil rights

_____

[36]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement. See Herrera v. Santa Fe Pub. Sch., 41 F. Supp. 3d at 1281.

cases, a superseding cause, as we traditionally understand it in tort law, relieves a
defendant of liability.  <u>See</u>, <u>e.g.</u>, <u>Warner v. Orange Cnty. Dep't of Prob.</u>, 115 F.3d
1068, 1071 (2d Cir. 1997); <u>Springer v. Seaman</u>, 821 F.2d 871, 877 (1st Cir. 1987),
<u>abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 (1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment

to the Constitution of the United States of America, the Tenth Circuit has held that government

actors "may be held liable if the further unlawful detention and arrest would not have occurred but

for their conduct and if there were no unforeseeable intervening acts superseding their liability."

<u>Martinez v. Carson</u>, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-

intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the

United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an
> arrest warrant and that they improperly enter without knocking and announcing
> their presence.  Once inside, they encounter the suspect, identify themselves, show
> him the warrant, and tell him that they are placing him under arrest.  The suspect,
> however, breaks away, shoots and kills two of the officers, and is preparing to shoot
> the third officer when that officer disarms the suspect and in the process injures
> him.  Is the third officer necessarily liable for the harm caused to the suspect on the
> theory that the illegal entry without knocking and announcing rendered any
> subsequent use of force unlawful?  The obvious answer is "no."  The suspect's
> conduct would constitute a "superseding" cause, <u>see</u> <u>Restatement (Second) of Torts</u>
> § 442 (1965), that would limit the officer's liability.  <u>See</u> <u>id.</u> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 1046 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for

reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt.b (1965)).

**3.    Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casaus, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted). The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8. Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.      Municipal Liability.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal

liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

Establishing an informal policy or custom requires the plaintiff to show that the misconduct was "widespread" -- i.e., that it involved a "series of decisions."  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  Although the existence or nonexistence of such a policy, practice, or custom is a question of fact for the jury, see Powers v. Hamilton Cty. Pub. Def. Comm'n, 501 F.3d 592, 599 (6th Cir. 2007)("[T]he evidence showed at least a disputed question of fact as to the existence of its alleged policy or custom . . . ."); Surprenant v. Rivas, 424 F.3d 5, 21 (1st Cir. 2005)("O'Mara challenges the very existence of the interdicted policy, custom, or practice.  Proving the existence of a policy, custom, or practice normally entails questions of fact." (citation omitted)); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 1999)("In order to avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation."); Gregory v. City of Rogers, 921 F.2d 750, 757 (8th Cir. 1990)("[A]ppellants have raised material questions of fact whether it was the custom of the Rogers Police Department that officers could use their discretion in deciding whether or not to arrest intoxicated individuals, despite the state statute requiring their arrest."); Fancher v. Barrientos, No. Civ. 11-118 LH/LAM, 2013 WL 8600085, at *4 (D.N.M. Aug. 19,

2013)(Hansen, J.)("[A]t this time the record is unclear and it remain a question of fact as to which policy was in place."); Jacobs v. Dujmovic, 752 F. Supp. 1516, 1525 (D. Colo. 1990)(Babcock, J.)("[T]he Jacobs have failed to meet their summary judgment burden of showing that it adopted a policy, custom or procedure that caused constitutional violations, or that there is a question of fact as to the existence of such a policy."), it is not a fact that can be baldly asserted at the pleading stage, see Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1187 (D.N.M. 2014)(Browning, J.); Atwell v. Gabow, Nos. 06-cv-02264-JLK, 07-cv-2063-JLK, 2008 WL 906105, at *6 (D. Colo. March 31, 2008)(Kane, J.). Pleading a municipal policy, custom, or practice is like pleading the breach element of negligence -- which is also ultimately a question of fact for the jury. The plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists. With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified. With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct -- no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible -- or use other evidence, such as a police officers' statements attesting to the policy's existence. The Tenth Circuit has not explicitly held that to be pleading requirements, but they have implied that district courts should analyze policies, practices, or customs under Monell as "legal conclusions" at the pleading stage -- which must evidence factual support, rather than conclusorily alleged -- and not "facts" in and of themselves, to be taken as true at face value:

> [T]he complaint alleges that the City of Denver Police Department had an official policy and plan to repress, vilify, and deny rights to Mexicanos, American Indians, and other "oppressed" national minorities, and that, pursuant to that plan, the Department formulated and issued a "get Martinez" policy and instructions. In furtherance of that policy, we are told, the Department kept a dossier on plaintiff, including reports, recordings, and other materials concerning his views, associations, and meetings. The Department also entered into a campaign to charge plaintiff and harass him and others advocating unpopular causes with unfounded prosecutions and to discourage him and others from asserting their rights. In or about October 1973, we are told, the Department, because of racial hatred and in order to chill the assertion of rights, obtained a warrant for the false and unfounded arrest of plaintiff, and, in or about November 1973, the Department "determined, in furtherance of its policy . . . as aforestated, to issue an order to all Denver Police Officers to 'shoot on sight' plaintiff."

> We think these allegations are clearly sufficient, as a matter of pleading, to satisfy the "policy" or "custom" requirement of Monell.

Martinez v. Winner, 771 F.2d 424, 443-44 (10th Cir. 1985)(citations to the complaint omitted). If a conclusory assertion that the Denver Police Department had such a policy in place would have sufficed to clear the rule 12(b)(6) bar, the Court sees little reason for the Tenth Circuit to have gone into this detailed recitation. The United States Courts of Appeals for the Seventh and Ninth Circuits have addressed this question squarely, and both have come down on the side that factual allegations giving rise to an inference that the policies exist must support the allegations of the existence of Monell policies. See McCauley v. City of Chicago, 671 F.3d 611, 618 (7th Cir. 2011)("In order to state a facially plausible equal-protection claim under Monell, the factual allegations in McCauley's complaint must allow us to draw the reasonable inference that the City established a policy or practice . . . ."); Svastics v. City of Beverly Hills, 178 F.3d 1300, 1999 WL 311217, at *1 (9th Cir. May 14, 1999)(unpublished table opinion)("The district court also properly dismissed the claims against the City because any allegations of an unconstitutional custom or

policy, even after amendment of the complaint, remained too conclusory to support a claim pursuant to Monell."); Strauss v. City of Chicago, 760 F.2d 765, 767 (7th Cir. 1985)("A complaint that tracks Monell's requirement of official policy with bare allegations cannot stand . . . . The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of Section 1983 liability devoid of any well-pleaded facts . . . ." (footnote omitted)).

> [T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies. On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.

Powe v. City of Chicago, 664 F.2d 639, 650 (7th Cir. 1981). The three district courts in the Tenth Circuit -- including the Court -- to have addressed the issue agree. In Atwell v. Gabow, the Honorable Thomas K. Kane, United States District Judge for the District of Colorado, dismissed a series of Monell claims on this ground:

> From the inception of this litigation, I have admonished counsel regarding the import of Monell and its progeny for Plaintiffs' municipal liability claims and have explicitly ordered them to identify "*specific factual allegations* supporting the conclusory allegations in the First Amended Complaint that Denver Health and/or Defendant Gabow acting in her official capacity made a policy decision, or engaged in a custom or practice of discrimination, for purposes of municipal liability.

> . . . .

> Plaintiffs do not identify a custom, policy or practice applicable to all of them that would render Denver Health liable under Monell for the discrimination each claims to have suffered, and none pleads actual facts giving rise to a plausible inference that such a policy, custom or practice existed. Simply aggregating eight individual claims and calling them the result of a "custom or policy of discrimination" is insufficient, as are all of the other conclusory recitations of Canton or similar legal standards as "facts" supporting municipal liability. Plaintiffs' 42 U.S.C. §§ 1981

and 1983 claims against Denver Health or Gabow, Rossman and Alexander in their "official capacities" are therefore DISMISSED.

Atwell v. Gabow, 2008 WL 906105, at *6, *8 (emphasis in original). In Granato v. City & County of Denver, Civil Action No. 11-cv-003047-MSK-BNB, 2011 WL 3820730 (D. Colo. 2011)(Krieger, J.), the Honorable Marcia S. Krieger, now-Chief United States District Judge for the District of Colorado, ruled similarly:

> At a minimum, a party asserting a Monell claim must plead sufficient facts to identify the unconstitutional custom or policy that was promulgated and the means by which that custom or policy caused the constitutional violation.
>
> Here, Ms. Granato's allegations of an unconstitutional custom or policy maintained by Denver Health are entirely conclusory. She offers only the "formulaic recitation" of a Monell claim, alleging that Mr. Khazanov "act[ed] and/or fail[ed] to act pursuant to City or State policy, custom, decision, ordinance, regulation, habit, usage or practice in [his] conduct," but never identifies precisely what particular custom or policy of Denver Health Mr. Khazanov was acting pursuant to . . . . As cases like Twombly and Iqbal make clear, such conclusory pleadings are insufficient to state a claim. Accordingly, Denver Health is entitled to dismissal of the Monell claim against it.

Granato v. City & Cty. of Denver, 2011 WL 3820730, at *8 (alterations in original)(footnote and citation omitted). Last, in Young v. City of Albuquerque, the Court dismissed a plaintiff's Monell claims on the same basis:

> [F]ar from asserting that the misconduct in this case was widespread, Young has not alleged any facts -- such as statistics, records of complaints filed with the city, or even anecdotal evidence -- that would indicate that the misconduct alleged in this case was more than an isolated incident. In fact, Young cannot point to another instance in which a City of Albuquerque employee has deprived another individual of his or her property rights without due process. A single incident is insufficient to establish the existence of a custom or practice. See City of St. Louis v. Praprotnik, 485 U.S. at 127 (explaining that a custom requires that the alleged misconduct is "widespread" -- i.e., involving a "series of decisions").

Young v. City of Albuquerque, 2014 WL 7473806, at *27. These cases all stand for the same proposition: at the pleading stage, the existence of a Monell policy is a "conclusion" to be built up to, rather than a "fact" to be baldly asserted.

When there is no formal written policy and the § 1983 plaintiff is relying upon a practice or custom, some courts appear to look for a specific number of prior similar incidents -- often saying that two or three instances will not suffice. See Wilson v. Cook Cty., 742 F.3d 775, 780 (7th Cir. 2014)("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident -- or even three incidents -- do not suffice."); Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)(holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995)(holding that two incidents of alleged excessive force are insufficient to show policy or custom). Other courts require only that the plaintiff plead that the policy exists, reasoning that the usual rule of pleading -- that courts are to accept all allegations as true at the motion-to-dismiss stage -- applies in the context of pleading a Monell policy, practice, or custom. See Bartholomew v. Fischl, 782 F.2d 1148, 1152-53 (3d Cir. 1986)(holding that a plaintiff who pleaded "a single instance of illegality" had nonetheless sufficiently "pleaded the existence of an official policy or official conduct sufficient to support municipal liability"); Estate of Bailey by Oare v. York Cty., 768 F.2d 503, 506-07 (3d Cir. 1985)(holding that courts are to accept allegations in the complaint as being true, including Monell policies, and writing that "a

federal court reviewing the sufficiency of a complaint has a limited task").[37]   The Court does not

believe a pre-determined numerical pleading standard is best, nor does the Court think that

pleading the facts of the plaintiff's individual case, and adding the conclusion "policy, practice, or

custom," suffice.   The plaintiff must plead what he or she knows -- whether it is a number of

incidents or some other evidence -- that renders plausible the plaintiff's conclusion that there is a

policy, custom, or practice in place.   If a police officer says there is a policy, that allegation may

be enough to plausibly suggest that the policy exists, even if the plaintiff can plead only one

specific instance of conduct.   If a police officer says he or she was told to do something down at

the stationhouse, that allegation, too, may be enough.   The expectation is that the plaintiff must

tell the Court at the outset, in the complaint, (i) why he or she thinks a policy exists -- alleging

specific facts; and (ii) what he or she thinks the policy is.   The Court will then decide whether (i)

plausibly suggests (ii).   The plaintiff must tell the Court, however, what he or she has, or else the

Court will disregard the alleged policy as a naked conclusion.   See Griego v. City of Albuquerque,

100 F. Supp. 3d 1192, 1213-16 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING MONELL CLAIMS

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

---

[37]These cases -- in addition to being from the United States Court of Appeals for the Third Circuit -- were decided well before Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.

The Supreme Court has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute." St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988). The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." St. Louis v. Praprotnik, 485 U.S. at 123 (citation omitted).

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability. Third, whether a particular official has final policymaking authority is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.

St. Louis v. Praprotnik, 485 U.S. at 123 (citations and internal quotation marks omitted). The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell, 436 U.S. at 694). See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba Cnty. Sheriff's Dep't, 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir. 1988)). Those elements apply when the plaintiff alleges that the acts of a final policymaker are the policy of the municipality. See Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d at 1319 ("The defendants do not deny that Sheriff Sharp, as the

supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment. Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment. If that decision -- the decision to enter the apartment -- resulted in a constitutional violation, the County would be liable." (citation omitted)).

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Paulter, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. at 845-46). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "Did the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"[T]o determine whether due process requirements apply in the first place, we must look

not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . purposely left to gather meaning from experience.'" Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (alterations in Bd. of Regents of State Colls. v. Roth)(quoting Nat'l Mut. Ins. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Regarding the meaning of the "liberty" guaranteed by the Fourteenth Amendment, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572 (citations omitted).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 (1970).  See Flemming v. Nestor, 363 U.S. 603, 611 (1960).  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 (1956), and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 (1952), have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-66.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

Property interests, of course, are not created by the Constitution.  Rather they are

created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

 "[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citation omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  The Supreme Court has explained that

the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations omitted)(internal quotation marks omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

**LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS**

The Supreme Court has stated that it is a judicial obligation to not only

preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)(internal quotation marks omitted)(citations omitted).  Most rights under the Constitution secure protection only against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments.").  Under some circumstances, however, private parties' conduct may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).  Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., 457 U.S. at 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. at 937. See West v. Atkins, 487 U.S. at 48 (explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct.  457 U.S. at 937.  The first prong of the test in Lugar v. Edmondson Oil Co. -- that the

deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]" 457 U.S. at 940. The second prong, identification of a defendant as a state actor, is met where the defendant "is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." 457 U.S. at 937. The Supreme Court applied these prongs and determined that the plaintiff's allegation that private unlawful conduct deprived him of his property without due process failed to state a claim under § 1983. See 457 U.S. at 940. The Supreme Court also held that the plaintiff's claim, which alleged that the private parties had invoked a state statute maliciously or without valid grounds, did not give rise to state action. See 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. See 457 U.S. at 940-41.

For a private individual to act under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and the defendant accused of a constitutional deprivation "must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936. Instead,

in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. See id. at 934. Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007)(unpublished).

## 1. Whether There Is State Action by Private Actors is a Legal Determination.

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004). According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, requires the sifting [of] facts and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)). In Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974), the Supreme Court said that, although it was the Supreme Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised. The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies." Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(per curiam).

In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction on state action from the United States District Court for the Eastern District of Michigan. 1986 WL 16606, at *1. The Sixth Circuit in a per curium opinion in which Judges Martin, Jones and Wellford joined, found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined." 1986 WL 16606, at *2. The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action. 1986 WL 16606, at *2-3. The Court on multiple occasions has ruled on dispositive motions that required a determination as a matter of law whether a private party was a state actor. See, e.g., Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1027 (D.N.M. 2014)(Browning, J.)(holding that private company providing security for school prom was a state actor); Archuleta v. City of Roswell, 898 F. Supp. 2d 1240 (D.N.M. 2012)(Browning, J.)(holding that private attorney was not a state actor engaged in a conspiracy against his client with prosecutors).

2.      **The Tests for Determining State Action by a Private Party.**

The Supreme Court has articulated four different tests for courts to use in determining

whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation."  (internal quotation marks omitted)).

### a.    The Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because, while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.    The Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 993 (1982).  A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself."  Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned

private remedies or procedures does not rise to the level of state action. . . .  But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found."  <u>Tulsa Prof'l Collection Servs., Inc. v. Pope</u>, 485 U.S. 478, 486 (1988)(citations omitted).

### c.      The Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity."  <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. at 725.  "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action."  <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity.  Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

<u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1452.

### d.      The Joint-Action Test.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents."  <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980).  Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1453.

"[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (citations omitted)(internal quotation marks omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook Cty., 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit, in an opinion that the Honorable Robert H. Henry, then-United States Circuit Judge for the Tenth Circuit, authored, and Judges Seymour and Daugherty joined, surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made

complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." Carey, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.

In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982)(per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation."

49 F.3d at 1454-55. The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." 49 F.3d at 1453. The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts. See Soldal v. Cook Cty., 506 U.S. at 60 n.4.

### 3. The Influence of Police Involvement on Transforming Private Action into State Action.

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983

liability.  See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (7th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra Co., 588 F.2d 1322, 1327 (10th Cir. 1978)).  In Yanaki v. Iomed, Inc., the plaintiffs argued that the involvement of police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co.] color of law test because the conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and [could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors.  See 415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

### LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th

Cir. 1999). An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (internal quotation marks omitted)(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003))).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10

(1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").  The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'"  United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006).  Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis."  United States v. LaVallee, 439 F.3d at 688.  See Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks.").  Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury."  United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred.  Wilson v. Seiter, 501 U.S. at 299.  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness."  Farmer v. Brennan, 511 U.S. at 836. The Supreme

Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct. See 490 U.S. at 394-95. More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'" 490 U.S. at 395. The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct." 490 U.S. at 395. The Supreme Court later clarified that its holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259,

272 n.7 (1997). To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory. See Cty. of Sacramento v. Lewis, 523 U.S. at 843-44 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.")(quoting U.S. CONST. amend. IV).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). See also Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *30-32.

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is a federal question if the case arises under the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 1331.

Whether a case arises under the federal law is determined by the "well-pleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 9 (1983)("Franchise Tax Bd."), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)). This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)). The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law on which the plaintiff's complaint relied creates a private cause of action. See Franchise Tax Bd., 463 U.S. at 25-26. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. 804, 813 (1986). See Sandoval v. N.M. Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("Merrell Dow is the controlling law when invoking subject matter jurisdiction" and when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a state cause of action presents

a federal question, because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the fact of the complaint, the "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)). If the resolution turns on a substantial question of federal law, the federal question must also be "contested." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005)("Grable & Sons"). Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing § 1331's application." Grable & Sons, 545 U.S. at 313. Particularly, the court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts. Grable & Sons, 545 U.S. at 318. See Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *7-9 (D.N.M. Apr. 30, 2009)(Browning, J.).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute." Kokkonen v.

Guardian Life Ins. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.

### 1.    Congressional Authority.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in three common-law doctrines -- pendent,[38] ancillary,[39] and pendent-party[40] jurisdictions -- the former two of which survive today.  The term "supplemental jurisdiction" is now used to refer collectively to the doctrines of ancillary jurisdiction and pendent jurisdiction.  28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437

---

[38]Black's Law Dictionary defines "pendent jurisdiction" as: "A court's jurisdiction to hear and determine a claim over which it would not otherwise have jurisdiction, because the claim arises from the same transaction or occurrence as another claim that is properly before the court." Jurisdiction, Black's Law Dictionary (10th ed. 2014).

[39]Black's Law Dictionary defines "ancillary jurisdiction" as: "A court's jurisdiction to adjudicate claims and proceedings related to a claim that is properly before the court." Jurisdiction, Black's Law Dictionary, supra.

[40]Black's Law Dictionary defines "pendent-party jurisdiction" as: "A court's jurisdiction to adjudicate a claim against a party who is not otherwise subject to the court's jurisdiction, because the claim by or against that party arises from the same transaction or occurrence as another claim that is properly before the court." Jurisdiction, Black's Law Dictionary, supra.

U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (1989)(outlining the now-defunct doctrine of pendent-party jurisdiction). Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. at 725. Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties whose insertion into the litigation lacks support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. at 375 n.18.

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms. See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. 2011)(Browning, J.)(citing 16 James Wm. Moore et al., Moore's Federal Practice § 106.04[5]). In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990[41]:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

---

[41]The Judicial Improvements Act of 1990 is codified at: 5 U.S.C. § 8440c; 17 U.S.C. §§ 106A, 120; 28 U.S.C. §§ 178, 471-82, 1367, 1658; 47 U.S.C. § 303c.

Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2. **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)). In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726. Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

**(1)** the claim raises a novel or complex issue of State law,

**(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

**(3)** the district court has dismissed all claims over which it has original jurisdiction, or

**(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered *Gibbs*' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of *Gibbs* in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994) ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *9 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). Other district courts in the Tenth Circuit besides this

Court have reached the same conclusion. See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated."). See also S.R. v. Hilldale Indep. Sch. Dist. No. I-29 of Muskogee Cty., No. CIV-07-335-RAW, 2008 WL 2185420, at *5 (E.D. Okla. 2008)(White, J.)(citing Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. at 1084).

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d at 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726. The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies. See Armijo v. New Mexico, No. CIV 08-0335 JB/ACT, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.). The Tenth Circuit has recognized that a district court does not "abuse discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it

has original jurisdiction.'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3)). See Shay v. RWC Consulting Grp., No. CIV 13-0140 JB/ACT, 2014 WL 3421068, at *1 (D.N.M. June 30, 2014)(Browning, J.)(dismissing federal-question claims, and remanding state claims that were all which remained); Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d 1121, 1145-47 (D.N.M. 2014)(Browning, J.)(concluding that a plaintiff's state law claims formed the same case or controversy as a federal claim, warranting jurisdiction over the federal claim and supplemental jurisdiction over the state clams).

## ANALYSIS

The Court concludes that the individual Defendants are entitled to qualified immunity, so the Court dismisses the § 1983 claims against them. With no federal claims remaining in the case, the Court remands the case to state court for determination of the NMTCA claims against Santa Fe County. The Proposed Second Amended Complaint cannot survive a motion to dismiss, so the Court denies the MTA, because the amendment is futile.

## I. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendants assert that the individual Defendants, against whom the Plaintiffs bring § 1983 claims, are entitled to qualified immunity, warranting the dismissal of the § 1983 claims against them. See MTD at 17. Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). When a defendant asserts qualified immunity, the plaintiff

must show: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107. "Failure on either qualified immunity element is fatal to the plaintiff's cause." Kerns v. Bader, 663 F.3d at 1180. The Plaintiffs have not sufficiently alleged that the Defendants violated Ortiz' constitutional rights and, in any case, the law on those rights is unsettled. The Defendants are thus entitled to qualified immunity.

The Court will follow the process that Saucier v. Katz outlined, first determining whether the Defendants' actions violated the Constitution and then, assuming any rights were violated, determining whether they were clearly established. See Saucier v. Katz, 533 U.S. at 201. Although the Court recognizes that this approach is no longer mandatory, it believes it will be "beneficial" under the circumstances. Pearson v. Callahan, 555 U.S. at 236. Specifically, there "would be little if any conservation of judicial resources" here, because it would be "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." Pearson v. Callahan, 555 U.S. at 236 (quoting Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005)(Sutton, J., concurring)). It is difficult to decide precisely what law is or is not clearly established unless the Court determines, as best it can, whether there is even a constitutional right at issue, what it is, what its scope is, and whether, under the facts and circumstances here, it was violated. This matter involves a recurring fact pattern, although unlikely exactly the same, requiring guidance on the challenged conduct's constitutionality which will only face challenges in the qualified immunity context. It is, in short, an appropriate case to "avoid avoidance," Camreta v. Greene, 563 U.S. at 705, because the exercise of determining

whether the Defendants violated Ortiz' constitutional rights will help the Court determine whether the law was clearly established. The Court will thus address whether any constitutional violations occurred before discussing whether the law was clearly established.

**A.    THE DEFENDANTS DID NOT VIOLATE ORTIZ' CONSTITUTIONAL RIGHTS.**

The Plaintiffs allege that the individual Defendants' and Santa Fe County's actions "violated Mr. Ortiz' Fourteenth Amendment right to due process because they deprived him of his right to life . . . ." First Amended Complaint ¶ 229, at 31. The Plaintiffs allege that pretrial detainees in State custody and convicted prisoners are entitled to protection from cruel and unusual punishment under the Fourteenth Amendment's Due Process Clause. First Amended Complaint ¶¶ 233-234, at 31. The Plaintiffs allege that Robinson specifically violated Ortiz' constitutional rights by: (i) "causing him an injury that equated to the minimal civilized measure of life's necessities"; and by (ii) "acting with a conscious disregard of a substantial risk of harm to Mr. Ortiz." First Amended Complaint ¶ 236, at 32. The Plaintiffs allege that Robinson violated Ortiz' Fourteenth Amendment Rights "because she knew of and disregarded an excessive risk to his health or safety." First Amended Complaint ¶ 238, at 32.

The Plaintiffs contend that the Fourteenth Amendment right in issue "is the right of pretrial detainees to adequate medical care for their serious medical needs." MTD Response at 23. Although the Fourteenth Amendment's Due Process Clause, and not the Eighth Amendment, regulates government officials' conduct in confining pretrial detainees, see City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983), the Tenth Circuit has held that "pretrial detainees . . . are entitled to the same degree of protection against denial of medical attention which applies to

convicted inmates" under the Eighth Amendment, <u>Garcia v. Salt Lake Cty.</u>, 768 F.2d 303, 307 (10th Cir. 1985). In <u>Estelle v. Gamble</u>, the Supreme Court outlined a test for deliberate indifference to serious medical needs against which the Tenth Circuit has held claims for inadequate medical attention must be judged. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' <u>Gregg v. Georgia</u>, [428 U.S. 153, 172 (1976)], proscribed by the Eighth Amendment."); <u>Estate of Hocker by Hocker v. Walsh</u>, 22 F.3d 995, 998 (10th Cir. 1994). The Supreme Court held that, to state a claim for deliberate indifference to serious medical needs, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs," and "an inadvertent failure to provide adequate medical care," such as "a complaint that a physician has been negligent in diagnosing or treating a medical condition," does not "state a valid claim of medical mistreatment under the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. at 105-06.

The Tenth Circuit stated that "[d]eliberate indifference has objective and subjective components." <u>Callahan v. Poppell</u>, 471 F.3d 1155, 1159 (10th Cir. 2006)(citing <u>Kikumura v. Osagie</u>, 461 F.3d 1269, 1291 (10th Cir. 2006)). The objective component requires that the harm suffered be "sufficiently serious" to implicate the Eighth Amendment's Cruel and Unusual Punishment Clause. <u>Kikumura v. Osagie</u>, 461 F.3d at 1291. Here, construing the allegations in the light most favorable to the Plaintiffs, the harm suffered, death because of acute gastrointestinal hemorrhage, is sufficiently serious. <u>See</u> First Amended Complaint ¶ 202, at 26. <u>See also</u> <u>Garrett v. Stratman</u>, 254 F.3d 946, 950 (10th Cir. 2001)(holding that the substantial harm requirement

"may be satisfied by lifelong handicap, permanent loss, or considerable pain.").

To prevail on the subjective component, the plaintiff must show "evidence of the prison official's culpable state of mind." Mata v. Saiz, 427 F.3d at 751. The plaintiff must demonstrate that the defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Kikumura v. Osagie, 461 F.3d at 1293 (citation and internal quotation marks omitted)(quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)). The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Mata v. Saiz, 427 F.3d at 751 (quoting Farmer v. Brennan, 511 U.S. at 837). Here, the Plaintiffs must allege plausible facts that the Defendants drew the inference that Ortiz was at risk of death or that the risk of death was obvious to each Defendant. See Martinez v. Beggs, 563 F.3d at 1089 . The Plaintiffs must also allege plausible facts to show that each Defendant acted with deliberate indifference to that risk. See Martinez v. Beggs, 563 F.3d at 1089-90. The Defendants contend that the "allegations of the plaintiffs' complaint fail to satisfy both elements." MTD at 20.

The Court first addresses Robinson, the sole medical personnel against whom the Plaintiffs assert a § 1983 claim. Regarding the knowledge component, the Tenth Circuit has held, whereas the ultimate harm presented is relevant to the objective inquiry, the deliberate indifference subjective inquiry is "limited to consideration of the doctor's knowledge at the time [s]he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." Self v. Crum, 439 F.3d at 1233. The Plaintiffs allege that, to satisfy the knowledge element, Robinson and the other individual Defendants need have known only that Ortiz was at risk because of a

"severe, life-threatening illness." MTD Response at 24. The Plaintiffs suggest that, if the individual Defendants were aware Ortiz was withdrawing from heroin and diagnosed with Hepatitis C, they knew he had a "severe, life-threatening illness," MTD Response at 24. The Plaintiffs note that, at the time of Robinson's intake, the ADF had "documented record of Mr. Ortiz' suffering from Hepatitis C"; and that Robinson knew and noted that Ortiz used drugs, specifically heroin; and that he anticipated withdrawal difficulties. First Amended Complaint ¶¶ 91, 99, 110, at 15, 17. The Supreme Court stated, however, that

> [p]rison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

Farmer v. Brennan, 511 U.S. at 844. Robinson knew the underlying facts that Ortiz would undergo heroin withdrawal while incarcerated and that he had Hepatitis C, but the Plaintiffs' allegations do not suggest that Robinson knew that those facts suggested a serious, life-threatening illness. See First Amended Complaint ¶¶ 92-93, at 15 (alleging that Robinson recorded Ortiz had no medical problems "requiring immediate attention," and that Ortiz had no current signs or symptoms of withdrawal). The Tenth Circuit held that a prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role," Sealock v. Colorado, 218 F.3d at 1211. The Plaintiffs do not allege that Robinson delayed or refused to intake Ortiz.

Even if Robinson knew or should have known that Ortiz was at risk because of a serious, life-threatening illness, the Plaintiffs' allegations do not plausibly show that she acted with

deliberate indifference to that risk.  See Martinez v. Beggs, 563 F.3d at 1089.  Robinson did not

deny Ortiz medical care, but, instead, placed Ortiz on the ADF's opioid withdrawal protocol that

provided Ortiz with medications to alleviate his anticipated symptoms of heroin withdrawal.  See

First Amended Complaint ¶¶ 112-14, 122, at 17-18.  At worst, "she misdiagnosed" Ortiz and

"failed to pass on information" about his symptoms in greater detail, which constitutes negligence

but not deliberate indifference.  See Sealock v. Colorado, 218 F.3d at 1211.  Under Tenth Circuit

caselaw, failure to prescribe a particular medication, such as methadone or buprenorphine, "does

not demonstrate deliberate indifference."  Boyett v. Cty. of Washington, 282 F. App'x 667,

674(10th Cir. 2008)(unpublished).  See Callahan v. Poppell, 471 F.3d at 1160 ("[A] prison doctor

remains free to exercise his or her independent professional judgment and an inmate is not entitled

to any particular course of treatment."  (internal quotation marks omitted)(quoting Dulany v.

Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997)); Perkins v. Kan. Dep't of Corrs., 165 F.3d 803,

811 (10th Cir. 1999)("[A] prisoner who merely disagrees with a diagnosis or a prescribed course

of treatment does not state a constitutional violation.").  The Plaintiffs make no allegations that

Ortiz was experiencing visible serious symptoms at the time of his intake beyond the statement

that another inmate perceived him as ill at an unspecified time close to the time of his intake.  See

First Amended Complaint ¶ 93, at 15 (alleging that an unidentified inmate who observed Ortiz

around the same time "noted that he looked sick").

    With regard to the other individual Defendants, the Plaintiffs allege that Chavez heard from

Ortiz and his cellmate that Ortiz was withdrawing from heroin and "throwing up blood,"  First

Amended Complaint ¶ 131, at 19; that Valdo knew Ortiz was withdrawing from heroin and that

Ortiz appeared severely ill during his interaction with Valdo, see First Amended Complaint ¶ 138, at 20; that Lopez personally observed Ortiz "dry heaving" in his cell and saw vomit on the floor, and observed Ortiz looking sick with a blank stare, First Amended Complaint ¶¶ 157-58, at 22; that Gallegos heard Ortiz "pushing" and making noises while on the toilet in his cell, First Amended Complaint ¶ 171, at 23; and that Garcia saw Ortiz "lying on his bed in the fetal position" and asked him if he was okay, and Ortiz responded with a hand signal that Garcia interpreted as affirmative, First Amended Complaint ¶¶ 168, 175, 177, at 23-24. The Plaintiffs allege that these allegations plausibly show that the individual Defendants were objectively aware of Ortiz' serious medical need and risk of significant harm. See MTD Response at 25-31. Under Tenth Circuit caselaw, each official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." Mata v. Saiz, 427 F.3d at 751 (quoting Farmer v. Brennan, 511 U.S. at 837). Although the Plaintiffs' allegations suggest that each of the individual Defendants was plausibly aware of facts from which they could have drawn the inference that a substantial risk of serious harm existed, the Plaintiffs do not allege facts that plausibly show that any of the individual Defendants drew the inference and believed Ortiz to be at a risk greater than the pain expected as part of heroin withdrawal. The Plaintiffs allege that Ortiz did not ask any of the Defendants for medical assistance. See First Amended Complaint ¶¶ 129-34, at 19 (alleging that Ortiz' cellmate Montano asked corrections staff to clean up the cell, but did not ask for medical assistance for Ortiz, and that Chavez relayed Ortiz' condition to the next shift of corrections officers); id. ¶ 137, at 20 (alleging that Ortiz asked Valdo to house him in "safe keeping" and not alleging that Ortiz ever asked to be housed in a medical

unit); id. ¶ 156, at 22 (alleging that Ortiz was mostly quiet in his interactions with Lopez); id. ¶ 173, at 23 (stating that, according to Gallegos, "Ortiz did not ask for medical assistance."); id. ¶ 177, at 24 (alleging that Garcia believed that Ortiz responded non-verbally that he was okay in response to Garcia's inquiry).  Construing the allegations in the light most favorable to the Plaintiffs, the Court concludes that the individual Defendants knew Ortiz was withdrawing from heroin, but there are no allegations plausibly showing that they knew that he was at risk of an outcome worse than the typical, serious, pains associated with heroin withdrawal.  Accordingly, the Court concludes that Robinson, Chavez, Valdo, Lopez, Gallegos, and Garcia did not violate Ortiz' constitutional right to adequate medical care for his serious medical needs.

**B.  EVEN IF THE DEFENDANTS VIOLATED ORTIZ' CONSTITUTIONAL RIGHTS, THESE RIGHTS WERE NOT CLEARLY ESTABLISHED.**

Even if the Court could, on the record before it, conclude, as a matter of law, that the Defendants violated Ortiz' constitutional rights, the Court concludes that the law was not clearly established such that a reasonable officer in any of the individual Defendants' positions would have recognized the unlawfulness of their actions regarding Ortiz.  Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  The Supreme Court requires district courts "not to define clearly established law at a high level of generality[,]" and requires that they focus on "whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added)(requiring that the "contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what

he is doing violates that right." (emphasis added)(alterations in <u>Ashcroft v. al-Kidd</u>)(internal quotation marks omitted)(quoting <u>Anderson v. Creighton</u>, 483 U.S. at 640)). It operates to protect officials from the law's "hazy border" and shields officers with "reasonable, but mistaken beliefs." <u>Saucier v. Katz</u>, 533 U.S. at 205. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." <u>Currier v. Doran</u>, 242 F.3d at 923.

As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference." <u>Kerns v. Bader</u>, 663 F.3d at 1188 (emphasis in <u>Kerns v. Bader</u>). In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." <u>Kerns v. Bader</u>, 663 F.3d at 1183. The Defendants contend that there

> is no case law within this Circuit that clearly establishes liability under Section 1983 upon a nurse who conducts a medical intake or similar preliminary screening evaluation for an acute event that a detainee experiences days later -- especially with no intervening interaction with the nurse, such as a request for medical assistance, reported symptoms or otherwise.

MTD at 22. The Plaintiffs cite to a Tenth Circuit and a Supreme Court case that they contend clearly establish that state officials have "a duty to protect individuals whom they ha[ve] taken involuntarily into their physical custody and control." MTD Response at 23 (internal quotation

marks omitted)(quoting <u>Liebson v. N.M. Corr. Dep't</u>, 73 F.3d at 277; and citing <u>Farmer v. Brennan</u>, 511 U.S. at 832 ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Defendants contend, in the MTD Reply, that there is no caselaw in this Circuit

> indicating that a plaintiff may overcome qualified immunity with an allegation that a nurse failed to foresee a complication that developed many days later, without any evidence of showing any notice to her of a request for medical care, change in symptoms or some other intervening event. There is no caselaw in this Circuit recognizing deliberate indifference to medical needs based on such an attenuated timeline. Plaintiff's recitation of general caselaw concerning the deliberate indifference standard falls short of providing a "particularized", "highly analogous" case demonstrating that a nurse, who is aware of potential withdrawal symptoms and places a detainee on a withdrawal protocol to treat those symptoms, is nevertheless deemed to be deliberately indifferent to the detainee's medical needs.

MTD Reply at 11.

There is no factually analogous case that convinces the Court that clearly established law prohibits the individual Defendants' conduct. <u>Farmer v. Brennan</u> addresses a general constitutional violation but is not factually analogous to the present case, where <u>Farmer v. Brennan</u> addressed the incarceration of a transsexual inmate within the general population despite noted safety concerns. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. at 848-49. In <u>Liebson v. New Mexico Corrections Department</u>, to which the Plaintiffs cite, the plaintiff, a librarian in a community college, was assigned under contract to provide library services to the maximum security unit inmates at the New Mexico State Penitentiary. 73 F.3d at 275. Until March 21, 1992, the penitentiary staffed a prison guard in the library at all times that plaintiff was on duty but after that date, the prison administrators changed library hours and the guard's schedule. <u>Liebson v. N.M. Corr. Dep't</u>, 73 F.3d at 275. A few days later, the plaintiff was on duty without a guard when an

inmate library assistant kidnapped her, held her hostage, and sexually assaulted her. Liebson v. N.M. Corr. Dep't, 73 F.3d at 275. Liebson v. New Mexico Corrections Department is not closely analogous to the custodial relationship between Ortiz and the individual Defendants, when the corrections department employed the plaintiff in Liebson v. New Mexico Corrections Department, and her "employment situation was sufficiently obvious to put a reasonable state official on notice that his conduct was constitutionally proscribed." 73 F.3d at 278. The Court notes that in Estelle v. Gamble, the Supreme Court held that states are constitutionally required to provide inmates "reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care is in fact delivered." Estelle v. Gamble, 429 U.S. at 116 n.13. Estelle does not clearly establish that non-medical personnel, such as corrections officers, are required to immediately secure medical treatment or attention for an inmate, in response to signs of inmate discomfort or medical need, and absent a request by the inmate or personal observation of sufficiently serious symptoms. In Perkins v. Kansas Department of Corrections, the plaintiff contended that he had been denied treatment for serious medical needs, in violation of the Eighth Amendment, because he did not receive a specific drug as treatment for his HIV. Perkins v. Kan. Dep't of Corr., 165 F.3d at 807. The Tenth Circuit held that a disagreement between an inmate and prison officials about how to treat a medical condition "does not give rise to a claim for deliberate indifference to serious medical needs." Perkins v. Kan. Dep't of Corr., 165 F.3d at 811. In duBois v. Payne County Board of County Commissioners, 543 F. App'x 841 (10th Cir. 2013), the Tenth Circuit held that jail staff did not violate the plaintiff inmate's constitutional rights simply because the plaintiff shared suicidal thoughts with jail staff and then committed suicide.

duBois v. Payne Cty. Bd. of Cty. Comm'rs, 543 F App'x at 848. A reasonable corrections officer might not have known that not seeking immediate attention for Ortiz, an inmate who, like many others, exhibited withdrawal symptoms but did not request medical attention, violates the inmate's right to reasonable access to medical care. The Court has not found a Tenth Circuit case holding that a corrections officer's failure to secure immediate medical care for an inmate, or an intake nurse's failure to complete intake paperwork, violates the inmate's constitutional rights. The Court concludes that the individual Defendants have not violated Ortiz' clearly established constitutional rights, and that under both prongs of the qualified immunity analysis, the individual Defendants are entitled to qualified immunity, and the Court dismisses the Plaintiffs' § 1983 claims against the individual Defendants. Having dismissed the § 1983 claims against the individual Defendants, the Court also dismisses the Plaintiffs' § 1983 claim against Santa Fe County, because there is no longer a constitutional violation for which Santa Fe County may plausibly be held liable under a vicarious liability or respondeat superior theory. See First Amended Complaint ¶ 230, at 31; Dodds v. Richardson, 614 F.3d 1185, 1194-95 (10th Cir. 2010).

## II.  THE COURT WILL DENY THE PLAINTIFFS' MOTION TO AMEND AS FUTILE.

Following the Order Granting Stay, Magistrate Judge Fashing vacated the Rule 16 Initial Scheduling Conference set for May 18, 2018, to be reset at a later date, if necessary. See Order to Vacate Rule 16 Initial Scheduling Conference, entered April 30, 2018 (Doc. 16)(text-only entry, no documents attached). Although a party may encounter greater difficulties if it seeks leave to amend after the time for amendment under a scheduling order has passed, because there is no current scheduling order here, rule 15's liberal standard for deciding a motion to amend remains

applicable instead of the more stringent standard applicable to change a rule 16 order.[42]  Rule 15(a)(1) provides that a party may amend its pleadings once as a "matter of course" within twenty-one days of serving the pleading, or twenty-one days after a service of a motion under rules 12(b), (e), or (f) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 15(a)(1).  The MTD was filed April 27, 2018, see MTD at 27, and the MTA was filed September 12, 2018, see MTA at 18, so the time for the Plaintiffs to amend as a matter of course has expired, and the Plaintiffs have already amended the Complaint once and now seek an opportunity to amend the First Amended Complaint again.  See MTA at 1.  Rule 15(a)(2) provides that, "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith, or dilatory motive[,] . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. at 182.  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d at 1284.  See also

---

[42]The Tenth Circuit has interpreted rule 16 as imposing a "good cause" standard to untimely motions to amend when a scheduling order governs the case.  Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 n.4 (10th Cir. 2006).  Accord Coffey v. United States, Nos. 08-0588, 09-0028, 2011 WL 5826004, at *7 (D.N.M. Nov. 14, 2011)(Browning, J.).  "This requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for the delay."  Minter v. Prime Equip. Co., 451 F.3d at 1205 n.4.  The Tenth Circuit has, since Coffey v. United States, determined that rule 16 applies to motions to amend.  See Gorsuch, Ltd. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1241 (10th Cir. 2014).

In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A Court may deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile." Jefferson Cty. Sch. Dist. v. Moody's Inv'r's Serv., 175 F.3d at 859. The Tenth Circuit has held that "[a] court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason." Chaara v. Intel Corp., No. 05-278, 2006 WL 4079030, at *4 (D.N.M. May 31, 2006)(Browning, J.)(internal quotation marks omitted). Thus, a court may deny leave to amend where the amended pleading "sets forth claims that would clearly not prevail or improve the party's position." Chaara v. Intel Corp., 2006 WL 4079030, at *4.

The Defendants do not argue in the MTA Response that the Plaintiffs Proposed Second Amended Complaint's amendments are made in bad faith, cause undue delay, are the result of dilatory motive, or prejudice the Defendants. See MTA Response at 1-10. The Court agrees that none of those factors is present in this case to a degree justifying denial of the amendment. The Plaintiffs "obtained a good deal of pertinent information from currently unfolding lawsuits in factually similar cases," and attempted to resolve, in the Proposed Second Amended Complaint, the Defendants' issues with the First Amended Complaint. MTA at 7. The Defendants filed a Motion to Stay, which Magistrate Judge Fashing granted, staying discovery and other proceedings pending resolution of the MTD, "and all deadlines have either been vacated or have yet to be set." MTA at 8. See Order Granting Stay at 1. The Court is not inclined to find a dilatory motive or undue delay on the part of the Plaintiffs when the Defendants stayed the lawsuit. Nor does the Court conclude that the proposed amendments would prejudice the Defendants, when they include,

in part, the dismissal of all NMTCA claims against the individual Defendants.  See MTA at 10.

Although the Plaintiffs add a new Count to the Proposed Second Amended Complaint, bringing

"a new cause of action against the County under Section 1983," the Plaintiffs contend that the

addition does not prejudice the Defendants, because all the allegations "arise out of the same

subject matter as Plaintiff's operative Complaint."  MTA at 11.  The Plaintiffs admit that the

Proposed Second Amended Complaint "attempts to resolve Defendants' various issues with the

operative First Amended Complaint," but the Plaintiffs allege that they "strongly believe that the

operative Complaint is more than sufficient to withstand dismissal under Rule 12(b)(6)."  MTA at

7.  The Court concludes, therefore, that the MTA is not the product of the Plaintiffs' desire to cure

deficiencies missed in a previously allowed amendment.

The Plaintiffs argue that the Proposed Second Amended Complaint is not futile, because

the "Plaintiffs' proposed amendments nourish a Complaint that was strong already."  MTA at 11-

12.  It is well established in the Tenth Circuit, however, that a "proposed amendment is futile if

the complaint, as amended, would be subject to dismissal," Bradley v. Val-Meijas, 379 F.3d 892,

901 (10th Cir. 2004), or if it fails to state a claim upon which relief may be granted, Ketchum v.

Cruz, 961 F.2d 916, 920 (10th Cir. 1992).  See Jefferson Cty. Sch. Dist. v. Moody's Inv'r's Servs.,

175 F.3d at 859.  The Defendants contend that the Plaintiffs' amendments are futile, but do not

specifically address the futility of the Plaintiffs' proposed amendments to Count II, the § 1983

claim against the individual Defendants.  See MTA Response at 18; MTA Reply at 8.  The

Plaintiffs state that they "do not offer substantive amendments to Count II -- while the paragraphs

under Count II are partly rewritten, they contain only allegations previously set forth in the

operative Complaint." MTA at 14. Because the Court concludes that the substantive allegations in Count II of the First Amended Complaint do not overcome the qualified immunity of the individual Defendants, the Court concludes that, with no substantive amendments to those allegations, the § 1983 claims against the individual Defendants in the Proposed Second Amended Complaint will not survive a motion to dismiss and are, therefore, futile. See Bradley v. Val-Meijas, 379 F.3d at 901.

The Plaintiffs propose adding an additional Count to the Proposed Second Amended Complaint. See MTA at 14. The Plaintiffs contend that the new Count III, "if allowed, will set forth a triable Fourteenth Amendment claim against the County under Section 1983." MTA at 14. The Plaintiffs assert that Santa Fe County is liable under § 1983 "because it adopted customs and practices that reflected a deliberate indifference to inmates' serious medical needs, particularly the serious medical needs of inmates suffering from alcohol and narcotics withdrawals, which resulted in a failure to provide such inmates with access to appropriate medical intake evaluations, monitoring, and/or treatment." Proposed Second Amended Complaint ¶ 292, at 44. The Plaintiffs contend that Count III sets forth allegations that the ADF has a "culture of deliberate indifference to withdrawing inmates' medical needs," which the DOJ investigation's findings bolster, and allegations regarding the deaths of Dr. Pederson, DeLaura, and Gambler, as well as regarding Ortiz' pattern of treatment at the ADF over eight incidents of incarceration. MTA at 15. The Plaintiffs argue that Santa Fe County's "widespread" "failure to train nursing staff," and its "failure to train 'non-medical employees'" to obtain necessary care for withdrawing detainees manifest its deliberate indifference to inmates' medical needs. MTA at 15-16 (quoting Proposed Second

Amended Complaint ¶ 297, at 46). The Plaintiffs contend that "the need for more or different training at ADF was so obvious . . . that the policymakers for Defendant Santa Fe County were clearly deliberately indifferent to the need." MTA at 16 (internal quotation marks omitted)(quoting Proposed Second Amended Complaint ¶ 298, at 47). The Plaintiffs contend that the individual Defendants' lack of training "was the moving force behind" Ortiz' death. MTA at 16-18. In ¶ 299 of the Proposed Second Amended Complaint, the Plaintiffs allege:

> Finally, Defendant Santa Fe County is liable under § 1983 because the County's actions and omissions were the moving force behind the violation of Mr. Ortiz' Fourteenth Amendment rights. The County's consistent failure to implement its own medical intake policies and denial of medical care to withdrawing inmates led directly to Mr. Ortiz' days-long decline and tortuous death. Moreover, Mr. Ortiz' death plainly could have been avoided had the individual Defendants been trained under an adequate program. If the individual Defendants had been trained to recognize serious medical conditions, particularly those involving inmates suffering from heroin or other opiate withdrawal, Mr. Ortiz would have been triaged into the Medical Unit, would have received critical follow-up monitoring of his symptoms of heroin withdrawal, and, if his symptoms had continued to worsen, would have been recognized as in need of emergency medical care, and would have received timely medical intervention.

Proposed Second Amended Complaint ¶ 299, at 47.

The Defendants contend that the Plaintiffs' proposed Count III, a <u>Monell</u> claim, "requires factual allegations that it was the County's policy to be deliberately indifferent to the medical needs of those in the ADF's custody." MTA Response at 8. The Supreme Court stated, in <u>Monell</u>, that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." MTA Response at 8-9 (quoting <u>Monell</u>, 436 U.S. at 694). A local government cannot be held liable under § 1983 on a respondeat superior theory, but can be sued directly under § 1983 only where "the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 659. Local governments may also "be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the government's official decision-making channels." Monell, 436 U.S. at 659. To establish municipal liability by way of a Monell claim, a plaintiff must: (i) identify a municipal policy or custom that caused his or her injuries, and (ii) must present evidence showing that the "municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Harte v. Bd. of Comm'rs of Cty. of Johnson, 864 F.3d 1154, 1195 (10th Cir. 2017)(quoting Dodds v. Richardson, 614 F.3d 1185, 1202 (10th Cir. 2010)). The plaintiff's burden is weighty: he or she must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769 (10th Cir. 2013).

Because the Court will dismiss all of the Plaintiffs' § 1983 claims against the individual Defendants, the Proposed Second Amended Complaint does not support a viable Monell claim. As Judge Johnson stated in Montoya on Behalf of S.M. v. Española Public School District Board of Education, No. CV 10-651 WPJ/LFG 2012 WL 13070109 (D.N.M. Dec. 6, 2012)(Johnson, J.),

> Plaintiffs must show the existence of a policy or custom that is causally connected to the violation of a Plaintiff's constitutional rights, which necessarily assumes that one or more Plaintiffs successfully allege a constitutional claim. . . . Because *Monell* claims are asserted against municipalities or entities which qualify as "persons" under § 1983, Plaintiffs' *Monell* claims -- and the requirements for liability under the *Monell* standard -- do not apply to these individual Defendants.

Instead, liability must be premised on these individuals' own conduct which allegedly violates Plaintiffs' federal constitutional rights.

Montoya on Behalf of S.M. v. Española Pub. Sch. Dist. Bd. of Educ., 2012 WL 13070109, at *2. With the dismissal of the Plaintiffs' § 1983 claims against the individual Defendants, there is no possibility of a Monell claim against Santa Fe County. See DeAnzona v. City and Cty. of Denver, 222 F.3d 1229, 1236 (10th Cir. 2000)(to establish a Monell claim, plaintiff must show an underlying constitutional violation).

Even if the Plaintiffs have stated a § 1983 claim against any of the individual Defendants, the Court concludes that the Plaintiffs have not alleged a plausible Monell claim upon which the Court can grant relief. The Tenth Circuit has broken a Monell claim into three elements: (i) official policy or custom; (ii) causation; and (iii) state of mind. See Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 769. Regarding the first element, a "challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770. "In attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." Carney v. City and Cty. of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008)(quoting Gates v. Unified Sch. Dist. No. 449, 996 F.2d 1035, 1041 (10th Cir. 1993)).

Regarding the second element, the challenged policy or custom must be "closely related to the violation of the plaintiff's federally protected right." Schneider v. City of Grand Junction

Police Dep't, 717 F.3d at 770 (internal quotation marks omitted)(quoting Martin A. Schwartz, Section 1983 Litigation Claims & Defenses, § 7.12[B] (2013)).  The plaintiff must show "the municipality was the 'moving force' behind the injury alleged."  Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770 (internal quotation marks omitted)(quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997)).  When municipal liability under § 1983 is based on inadequate training, supervision, or hiring, the "causation element is applied with especial rigor."  Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770 (quoting Schwartz, supra at § 7.12).

Regarding the third element, a plaintiff must demonstrate "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770 (internal quotation marks omitted)(quoting Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. at 407).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  In Barney v. Pulsipher, the Tenth Circuit noted that the plaintiffs' failure-to-train claim failed, because the record lacked evidence that the County acted with deliberate indifference, where "no pattern of violations existed to put the County on notice that its training program was deficient in this regard."  Barney v. Pulsipher, 143 F.3d at 1308.  The

Supreme Court noted that municipal liability under § 1983 "is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. at 61. The plaintiff "must identify a specific deficiency in the county's training program closely related to his ultimate injury." Lopez v. LeMaster, 172 F.3d 756, 760 (10th Cir. 1999).

First, the Plaintiffs point to "Ortiz' own history at the facility, the 2003 DOJ Report, and the cases of inmates Pederson, DeLaura, and Gambler," as "evidence that ADF's actions in manifesting deliberate indifference to withdrawing inmates' serious medical needs 'were so persistent, continuing, and widespread as to constitute a custom." MTA at 6 (quoting Proposed Second Amended Complaint ¶¶ 293-295, at 44-45). The Plaintiffs do not allege a formal ADF policy, but, rather, that the ADF engaged in deliberately indifferent training or supervision of its employees. See Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770. The Plaintiffs allege that Dr. Pederson, DeLaura, and Gambler are "all similarly-situated individuals who were mistreated by Defendant Santa Fe County in a similar way." Proposed Second Amended Complaint ¶ 294, at 45. See Carney v. City and Cty. of Denver, 534 F.3d at 1274. Beyond the conclusory allegation, however, the Plaintiffs do not sufficiently allege how Dr. Pederson, DeLaura, and Gambler were situated similarly to Ortiz, particularly in terms of Santa Fe County's role in their deaths. The Plaintiffs allege that the ADF intake nurse's decision not to place Dr. Pederson in the medical unit was informed in part by the "dearth of empty beds in the medical unit on the night of Dr. Pederson's medical intake," a factor not cited as relevant in Ortiz' case. Proposed Second Amended Complaint ¶ 246, at 34. Dr. Pederson died "while suffering from severe alcohol withdrawal," a condition for which the Plaintiffs allege no particular treatment

protocol at the ADF -- in contrast to opiate withdrawal, which the ADF routinely treated with the administration or offer of a kick kit of medications to alleviate withdrawal symptoms. Proposed Second Amended Complaint ¶ 245, at 34. See Proposed Second Amended Complaint ¶ 269, at 39. The Plaintiffs do not sufficiently allege that Ortiz and Dr. Pederson are similarly situated, when Ortiz, per the ADF's protocol, was administered a packet of medications designed to alleviate his symptoms, and it is not clear Dr. Pederson was placed on any specific or routine protocol to respond to his alcohol withdrawal symptoms. The Plaintiffs allege that DeLaura "died of complications from severe alcohol withdrawal, one day after his medical intake," but do not allege how the ADF's purported deliberate indifference or denial of proper medical attention contributed to his death, or how the circumstances of his death are like those of Ortiz' death. Proposed Second Amended Complaint ¶ 254, at 35. The Plaintiffs allege that Gambler "was placed within the medical unit of ADF," but that "she was not monitored as routinely required by ADF policy, and was treated with only over-the-counter painkillers and routine alcohol withdrawal medication, even as her condition rapidly deteriorated." Proposed Second Amended Complaint ¶ 255, at 36.[43] Gambler "was transferred from ADF to Rio Arriba County Detention Facility" and

---

[43]The Plaintiffs also allege that

[i]f the individual Defendants had been trained . . . , Mr. Ortiz would have been triaged into the Medical Unit, would have received critical follow-up monitoring of his symptoms of heroin withdrawal, and, if his symptoms had continued to worsen, would have been recognized as in need of emergency medical care, and would have received timely medical intervention.

Proposed Second Amended Complaint ¶ 299, at 47. The Plaintiffs suggest that, if Ortiz had been triaged into the Medical Unit, his "death plainly could have been avoided." Proposed Second Amended Complaint ¶ 299, at 47. Based on the Plaintiffs' allegations regarding Gambler,

died there.  Proposed Second Amended Complaint ¶ 255, at 36.  Gambler was placed in the ADF's Medical Unit and Ortiz was not, and Gambler and Ortiz died at two different facilities.  Although the Plaintiffs make the conclusory allegation that Gambler and Ortiz are similarly situated, the Court concludes the Plaintiffs do not plausibly allege a similarity between Santa Fe County's role in each death and cannot sustain an allegation of a deficient custom based solely on the 2003 DOJ Report on conditions over a decade ago.  See Proposed Second Amended Complaint ¶ 294, at 45.

Regarding Ortiz' own history at the ADF, the Court concludes that the Plaintiffs do not plausibly allege facts demonstrating a custom or practice at the ADF of inadequate medical intake procedures.  At Ortiz' initial intake, the ADF's intake nurse completed a Medical Intake History and Screening form, and a COWS form.  See Proposed Second Amended Complaint ¶¶ 49-50, at 10.  The Plaintiffs make no allegations that this intake procedure was deficient, although the Plaintiffs allege that "there is no evidence that ADF engaged in regular follow-up monitoring of Mr. Ortiz' withdrawal symptoms beyond the initial assessment."  Proposed Second Amended Complaint ¶ 53, at 10.  At Ortiz' July, 2013, intake, the intake nurse completed a Medical Services form -- except for the intake housing recommendation section -- and completed a History and Physical form noting Ortiz' history of substance abuse.  See Proposed Second Amended Complaint ¶¶ 55-56, at 11.  At Ortiz' November, 2013, intake, the intake nurse completed a Medical Intake

---

however, it appears that the Plaintiffs contend that, even when an inmate is admitted to the ADF's Medical Unit, they might not receive adequate monitoring or care.  See Proposed Second Amended Complaint ¶ 255, at 36.  Construing these allegations together, and in a manner most favorable to the Plaintiffs, the Court is not convinced that the Plaintiffs plausibly allege that, had Ortiz been triaged into the Medical Unit, his "death plainly could have been avoided," or that Santa Fe County's alleged failure to train its personnel to "implement its own medical intake policies . . . led directly to" Ortiz' death.  Proposed Second Amended Complaint ¶ 299, at 47.

History and Screening form -- except for the portion of the form asking whether Ortiz would get sick if he stopped using drugs -- and a History and Physical form. <u>See</u> Proposed Second Amended Complaint ¶¶ 59-60, at 11. The Plaintiffs allege that the November, 2013, Medical Intake History and Screening form "notes a history of heroin abuse, as well as recent treatment for anxiety, depression, and PTSD." Proposed Second Amended Complaint ¶ 60, at 11. In December, 2013, Ortiz entered the ADF again, and upon intake, the intake nurse completed a Medical Intake History and Screening form -- noting no drug use or history -- and placed Ortiz on suicide watch. <u>See</u> Proposed Second Amended Complaint ¶ 63, at 12. On September 3, 2014, Ortiz reentered the ADF, the intake nurse completed a History and Physical Form, and the intake nurse placed him on an opiate protocol, but left a Medical Intake History and Screening form (dated September 12, 2014) mostly blank. <u>See</u> Proposed Second Amended Complaint ¶¶ 64-65, at 12. On September 25, 2014, Ortiz reentered the ADF, and the intake nurse completed a Medical Intake History and Screening form, asserting he did not take drugs and not noting any history of substance abuse. <u>See</u> Proposed Second Amended Complaint ¶ 67, at 12. In February, 2015, Ortiz reentered the ADF, and the Plaintiffs do not allege which forms were completed upon this intake. <u>See</u> Proposed Second Amended Complaint ¶ 69, at 12. Of note, the Plaintiffs' descriptions of Ortiz' various intakes do not reveal the same alleged deficiencies. <u>See</u> Proposed Second Amended Complaint ¶¶ 49-50, 53, 55-56, 59-60, 63, 64-65, 67, 69, at 10-12. The Plaintiffs' allegations suggest that, for some intakes, the intake nurse fully completed the relevant forms, and for the intakes where forms were partially completed, each time, the forms were partially completed in a different manner -- leaving different sections blank. <u>See</u> Proposed Second Amended Complaint ¶¶ 49-50,

53, 55-56, 59-60, 63, 64-65, 67, 69, at 10-12.  There is no allegation that any of the prior, allegedly deficient, intakes harmed Ortiz during any of his prior terms of incarceration.[44]  Even construing the Plaintiffs' allegations regarding Ortiz' history at the ADF, and the circumstances surrounding Dr. Pederson's, DeLaura's, and Gambler's deaths, in the light most favorable to the Plaintiffs, the Plaintiffs do not plausibly allege a practice at the ADF persistent enough to constitute a custom.

The Plaintiffs contend that Santa Fe County is also liable under § 1983 for its failure to train intake nurses to properly perform intakes and complete paperwork, and its failure to provide training to non-medical corrections personnel "to obtain vitally necessary medical care to detainees suffering from symptoms of withdrawal."  Proposed Second Amended Complaint ¶¶ 296-97, at 46.  Although the Plaintiffs allege that Robinson "did not go through orientation with regard to the performance of medical intakes," the Plaintiffs do not allege that no such orientation exists or that intake nurses at the ADF are not typically trained on the performance of medical intakes.  Proposed Second Amended Complaint ¶ 87, at 15.  The Plaintiffs allege that the ADF had a set of Intake Guidelines which Robinson and other intake nurses were required to follow, and the Plaintiffs do not allege that these Intake Guidelines were deficient.  See Proposed Second Amended Complaint ¶ 77, at 13.  Furthermore, the Plaintiffs allege that non-medical corrections personnel, such as

---

[44]Nor do the Plaintiffs allege that intake is a procedure which takes place on the first day of an inmate's incarceration;  on September 3, 2014, Ortiz reentered the ADF, but his Medical Intake History and Screening form for this period of incarceration is dated September 12, 2014, suggesting that intake may occur over several days -- and the Plaintiffs do not suggest that this practice is deficient in any way.  See Proposed Second Amended Complaint ¶¶ 64-65, at 12.  Ortiz reentered the ADF for the last time on January 4, 2016, and died on January 7, 2016.  See Proposed Second Amended Complaint ¶¶ 118, 121, at 18.  The Plaintiffs do not allege whether Ortiz' intake procedures or medical assessments had been declared complete by the time of his death.

Chavez, were trained. See Proposed Second Amended Complaint ¶ 140, at 21 ("Further, on information and belief, Officer Chavez' training included training to recognize the signs of an inmate in need of emergency medical attention . . . ."). See also Proposed Second Amended Complaint ¶ 148, at 22 (noting the Plaintiffs' belief that Valdo's training included training to recognize inmates at risk of serious harm); id. ¶ 173, at 25 (noting the Plaintiffs' belief that Lopez' training included training to recognize the signs of an inmate in need of immediate medical attention); id. ¶ 185, at 26-27 (noting the Plaintiffs' belief that Garcia's training included training to recognize the signs of an inmate requiring immediate medical assistance); id. ¶ 192, at 27-28 (noting the Plaintiffs' belief that Gallegos' training included training to recognize the signs of an inmate in need of immediate medical attention). The Plaintiffs note that, in the event the officers did not receive this training, "that would constitute evidence of Defendant Santa Fe County's failure to train its corrections officers to ensure that at-risk inmates suffering from opiate withdrawal receive necessary medical care." MTA at 27 n.4. Given the Plaintiffs' belief that all of the individual Defendants received training regarding the care of withdrawing inmates, the Plaintiffs do not plausibly allege that the Defendants' lack of training "was the moving force behind" Ortiz' death. MTA at 16-18. Nor do the Plaintiffs allege that any of the individual Defendants personally observed symptoms of severe medical need in Ortiz -- for example, while Ortiz told Chavez he vomited blood, the Plaintiffs do not allege that Chavez saw bloody vomit himself. See Proposed Second Amended Complaint ¶ 284, at 42. Regarding the second element of the Monell claim, when municipal liability under § 1983 is based on inadequate training, supervision, or hiring, the "causation element is applied with especial rigor . . . ." Schneider v.

City of Grand Junction Police Dep't, 717 F.3d at 770 (quoting Schwartz, <u>supra</u> at § 7.12).  The Court concludes that the Plaintiffs have not shown that inadequate training or supervision caused Ortiz' death.

Even if the Plaintiffs have alleged the first two elements of a <u>Monell</u> claim -- and they have not -- the third element is not met.  Regarding the third element, a plaintiff must plausibly allege "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d at 770 (internal quotation marks omitted)(quoting <u>Board of Cty. Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. at 407).  The Plaintiffs have not alleged that the ADF failed to train its employees in specific skills, and, in fact, state that, on their information and belief, all of the individual employees named as Defendants were trained.  <u>See</u> Proposed Second Amended Complaint ¶ 140, at 21 ("Further, on information and belief, Officer Chavez' training included training to recognize the signs of an inmate in need of emergency medical attention . . . .").  <u>See also</u> Proposed Second Amended Complaint ¶ 148, at 22 (noting the Plaintiffs' belief that Valdo's training included training to recognize inmates at risk of serious harm); <u>id.</u> ¶ 173, at 25 (noting the Plaintiffs' belief that Lopez' training included training to recognize the signs of an inmate in need of immediate medical attention); <u>id.</u> ¶ 185, at 26-27 (noting the Plaintiffs' belief that Garcia's training included training to recognize the signs of an inmate requiring immediate medical assistance); <u>id.</u> ¶ 192, at 27-28 (noting the Plaintiffs' belief that Gallegos' training included training to recognize the signs of an inmate in need of immediate medical attention).  Nor have the Plaintiffs alleged any specific deficiency in the ADF's training program closely related to Ortiz' death.  <u>See Lopez v. LeMaster</u>,

172 F.3d at 760. The Supreme Court has noted that municipal liability under § 1983 "is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. at 61. The Plaintiffs do not, based on the proposed allegations in the Proposed Second Amended Complaint, state a Monell claim upon which the Court may grant relief. Accordingly, the Court concludes that the Proposed Second Amended Complaint is futile. See Bradley v. Val-Meijas, 379 F.3d at 901; Ketchum v. Cruz, 961 F.2d at 920. The Court denies the MTA.

## III. THE COURT WILL REMAND THE REMAINING STATE LAW CLAIMS.

Removal to federal court was pursuant to 28 U.S.C. § 1441, which grants federal court jurisdiction over cases involving federal questions. See Notice of Removal at 1. The parties do not have, nor do they allege to have, any other basis of federal jurisdiction, such as diversity of citizenship. See Notice of Removal at 1. The Court will dismiss the only claims on which the Court has original, federal jurisdiction.

The Court declines to exercise jurisdiction over the remaining claims. All the remaining claims sound in state tort law, arising under the NMTCA. These are issues best left to the New Mexico courts rather than federal court. Furthermore, discovery has not yet begun. It is thus possible that discovery may be necessary before any court decides the state law claims. Given that this case may be in the early stages, the case should proceed in state court rather than in federal court. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 & n.7 (1988)(noting that there is no mandatory rule requiring dismissal of state claims after the court dismisses the only claim or claims establishing federal jurisdiction, but stating that "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that

court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice . . . .").

The statute governing supplemental jurisdiction, 28 U.S.C. § 1367(a), provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). One situation in which the court may decline to exercise supplemental jurisdiction over an otherwise related claim under subsection (a) is when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Court therefore remands the remaining state law claims to state court.

**IT IS ORDERED** that: (i) the Defendants' Motion to Dismiss, filed April 27, 2018 (Doc. 13), is granted in part and denied in part; (ii) all federal claims and Defendants are dismissed; and (ii) the Plaintiffs' Motion to Amend the Complaint, filed September 12, 2018 (Doc. 30), is denied. The Court remands the case with its remaining state claims to the First Judicial District Court, County of Santa Fe, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

- 170 -

Carolyn M. Nichols
Alicia Consuelo Lopez
Rothstein Donatelli LLP
Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Mark E. Komer
Long Komer & Associates, P.A.
Santa Fe, New Mexico

*Attorneys for the Defendants*

Mark E. Komer
Long Komer & Associates, P.A.
Santa Fe, New Mexico

--and--

Christa M. Hazlett
Conklin, Woodcock & Ziegler, P.C.
Albuquerque, New Mexico

*Attorney for the Defendants Santa Fe County and Anne Robinson*